*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re VIERZEN/SHILTON, Minor.

UNPUBLISHED
January 23, 2020

No. 347411
Ionia Circuit Court
Family Division
LC No. 2017-000508-NA

Before: MARKEY, P.J., and GLEICHER and M. J. KELLY, JJ.

PER CURIAM.

The circuit court terminated respondent-mother's parental rights to her three children, who then ranged in age from eight months to four years, under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j). Respondent does not challenge the statutory grounds for termination, but complains that the court prematurely conducted a permanency planning hearing after only 10 months and terminated her parental rights without allowing her further time to benefit from her case service plan. Respondent also asserts that termination was not in her children's best interests as the children could have been placed in a relative guardianship. We discern no error and affirm.

## I. BACKGROUND

Respondent is no stranger to the child protective system. From 2015 through December 2017, respondent had 15 contacts with Child Protective Services (CPS). Before the current proceedings, CPS had made efforts to keep respondent's children in her home. CPS made two separate referrals to Families First, but both were closed out based on respondent's lack of cooperation. CPS referred respondent to a family-safe shelter during a period of homelessness and to a nonprofit organization that provides aid to low-income and homeless families. CPS also provided "Family Preservation" services. Respondent did not demonstrate improvement; in November 2017, respondent stated her intent to commit suicide on Facebook and her boyfriend brandished a knife during a domestic violence incident while her children were in the home. When CPS came to investigate, they found the apartment filthy, with animal feces throughout. The Department of Health and Human Services (DHHS) filed a petition for removal of LMV (d/o/b December 22, 2014) and LJV (d/o/b February 2, 2017) on December 12, 2017. Respondent was then pregnant with her third child, DLS, who was born on May 2, 2018. In support of removal, the DHHS cited respondent's continuing unstable, unsafe, and unsanitary

living arrangements, domestic violence incidents between respondent and her romantic partners, and respondent's emotional instability.

Respondent had been removed from the care of her own birth mother at a very young age and had been adopted by the age of four. Respondent did not get along with her adoptive family and requested that her children not be placed with any of her adoptive relatives. She recommended placement with an aunt and uncle, presumably from her biological family, but those individuals never came forward to apply for custody. Accordingly, the DHHS placed LMV, LJV, and subsequently DLS with respondent's second cousin from her adoptive family. Evidence in the lower court record supports that these relatives have taken exceptional care of the children. However, the relatives stated early on that they would not supervise visits with respondent in their home. And they were willing to adopt.

From December 2017 through January 2019, the DHHS provided services for respondent. After a January 15, 2018 psychological evaluation, a psychologist diagnosed respondent "as a pronounced inadequate and dependent personality with antisocial features" with "borderline intellectual and social development" and "an impulse control disorder which may involve outbursts of angry behavior in order to gain control or chase away disapproval." The DHHS referred respondent for counseling, but respondent did not like her initial therapist and changed providers. As a result of this change and several missed appointments, respondent made little progress in therapy. By the time of the termination hearing, respondent was still exhibiting emotional instability. The psychologist testified that respondent would require at least another year to achieve stability in her own life and even longer before she could provide a stable life for her children.

The DHHS also provided services to address respondent's pattern of domestic violence. Since the onset of CPS involvement, workers noted respondent's own acts of domestic violence against her romantic partners, in addition to violence inflicted by her boyfriends. On October 23, 2018, on the eve of the final hearing before termination, respondent was arrested for assaulting DLS's father and punching her hand through the windows in their home. Respondent was incarcerated for a week as a result.

And respondent's housing situation had not improved. Respondent migrated between apartments owned by friends and acquaintances. For a time, respondent lived with DLS's father in a pop-up camper in someone else's yard. When the couple quarreled, respondent moved to a shelter. Between December 2017 and September 2018 alone, respondent had lived in eight different places.

Overall, evidence established that respondent participated in various services, but showed little improvement. Supervised parenting times did not go smoothly as respondent was unable to manage all three children. Respondent often focused on the case and her disagreements with service providers and relatives rather than her children. On one occasion, respondent became angry because she believed DLS's father (who was then approximately 25 years old) was having a sexual relationship with the mother of the children's relative caregiver.

Following a one-day termination hearing in January 2019, the circuit court found termination of respondent's parental rights supportable under MCL 712A.19b(3)(c)(*i*) and (c)(*ii*) (182 days had elapsed since adjudication and respondent had not rectified the conditions that led to adjudication, new issues had arisen, and respondent would be unable to rectify these conditions within a reasonable time), (g) (failure to provide proper care and custody when financially able to do so), and (j) (reasonable likelihood that the child will be harmed if returned to respondent's care). In concluding that termination was in the children's best interests, the court acknowledged that the children had been placed with relatives, but noted that the caregivers were not willing to enter a long-term guardianship and that respondent's behavior rendered a guardianship unadvisable.

## II. PREMATURE TERMINATION

Respondent contends that the circuit court prematurely terminated her parental rights because (1) the court promised to wait a year until the permanency planning hearing and instead conducted it after 10 months, and (2) the court should have allowed respondent additional time to participate in services as she began showing improvement shortly before the termination hearing.

The circuit court was not required to allow an entire year to elapse before the permanency planning hearing and did not violate respondent's rights by holding that hearing about six weeks shy of the one-year mark. On January 25, 2018, respondent pleaded to grounds for court jurisdiction over her two eldest children. At that proceeding, the circuit court advised respondent of many of her rights and explained the timeline of a child protective proceeding. Relevant to this appeal, the court advised respondent that it would conduct review hearings approximately every 91 days. The court continued that "if we get to December 12th of 2018 and the children have not been returned, then we will have what's called a permanency planning hearing . . . and that's a very important hearing in this type of case, because we discuss whether to continue to working [sic] toward a possible reunification or consider some other options." At the close of the August 1, 2018 dispositional review hearing, the court set the next hearing for October 31. The court directed that this would be "a combined dispositional review, as well as a permanency planning hearing." The court acknowledged "that's still about six weeks prior to the anniversary of the initial removal," but noted "we're not going to have another hearing within the year, so we'll call that the combined dispo review and permanency planning hearing."

Respondent did not object below to the permanency planning hearing being held on October 31, rather than in December 2018. Our review is therefore limited to plain error affecting respondent's substantial rights. *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008). A circuit court may err by prematurely terminating a respondent's parental rights when the "respondent was not afforded a meaningful and adequate opportunity to participate." *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). Generally, a trial court provides a respondent a meaningful opportunity to participate by adhering to court rules and statutes. See *id*. ("Here, because the DHS and the court failed to adhere to court rules and statutes, respondent was not afforded a meaningful and adequate opportunity to participate.").

-3-

MCL 712A.19a(1) provides, in relevant part:

> Subject to subsection (2), if a child remains in foster care and parental rights to the child have not been terminated, the court shall conduct a permanency planning hearing *within 12 months* after the child was removed from his or her home. Subsequent permanency planning hearings shall be held no later than every 12 months after each preceding permanency planning hearing during the continuation of foster care. If proper notice for a permanency planning hearing is provided, a permanency planning hearing may be combined with a review hearing held under [MCL 712A.]19(2) to (4) of this chapter, but no later than 12 months from the removal of the child from his or her home, from the preceding permanency planning hearing, or from the number of days required under subsection (2). A permanency planning hearing shall not be canceled or delayed beyond the number of months required by this subsection or days as required under subsection (2), regardless of whether there is a petition for termination of parental rights pending. [Emphasis added.]

The circuit court was not obligated to adhere to its 12-month reference regarding the scheduling of the permanency planning hearing. MCL 712A.19a specifically requires that the court "conduct a permanency planning hearing *within* 12 months after the child was removed from his or her home." MCL 712A.19a(1) (emphasis added). Accordingly, the court could not have conducted the hearing beyond December 11, 2018. Moreover, the court's statement at the adjudication was not a promise to wait a full year before conducting a permanency planning hearing; the court merely gave a generalized explanation of the procedure for respondent's benefit. Relief is not warranted on this ground.

Respondent did object to the timing of the termination hearing, however, at the October 31, 2018 permanency planning hearing. Respondent's counsel contended that respondent then had suitable housing and had been actively participating in services, although in a different county. Counsel requested that the court give respondent an additional three-month period to participate in services before considering an amended petition seeking termination. The court denied this request.

Although respondent now claims that she had shown recent improvement meriting an extension of time, she ignores that she was arrested on October 23, 2018 for domestic violence against DLS's father. Respondent's behavior was so out of control that she punched out the windows of their home with her bare hands. Although respondent had reinitiated counseling, she did not do so until the fall of 2018, too short a period to exhibit any improvement. Moreover, the official services provided to respondent were not limited to the span of this child protective proceeding. As noted, CPS had been providing various services to respondent since 2015. After nearly three years of services, conditions only deteriorated and the DHHS was required to take respondent's children into care. Respondent then had an additional 13 months between the initiation of the petition and the termination hearing and still had not rectified any of the concerning conditions cited by CPS and the DHHS. On this record, we cannot fault the circuit court's conclusion that providing further time would have been futile.

-4-

III. BEST INTERESTS

Respondent further contends that the circuit court erroneously determined that termination of her parental rights was in the children's best interests when the court could have placed the children in a relative guardianship. "Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012), citing MCL 712A.19b(5). "[W]hether termination of parental rights is in the best interests of the child must be proven by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). The court should weigh all the evidence available to it in determining the child's best interests. *In re Trejo*, 462 Mich 341, 356-357; 612 NW2d 407 (2000). And we review the court's factual findings in this regard for clear error. *In re Brown/Kindle/Muhammad Minors*, 305 Mich App 623, 637; 853 NW2d 459 (2014).

"Generally, a child's placement with relatives weighs against termination." *In re Gonzales/Martinez*, 310 Mich App 426, 434; 871 NW2d 868 (2015) (quotation marks and citation omitted). But relative placement is only one factor among many to consider and the combination of other facts may outweigh that placement. A court must also consider "the child's bond to the parent, the parent's parenting ability, [and] the child's need for permanency, stability, and finality," as well as the advantages of the foster home over the child's home with the parent. *Olive/Metts*, 297 Mich App at 41-42 (quotation marks and citations omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014).

Here, respondent had been receiving services for almost four years by the time of the termination trial and yet had showed little benefit. Respondent continued to choose relationships marred by domestic violence and to use violence herself against her romantic partners. Respondent still exhibited emotional instability and angry outbursts. She still had not remained in any home for any appreciable length of time. Overall, respondent was completely unable to provide the children with any permanence or stability. This evidence weighed heavily in favor of termination.

On the other side of the scale, the children were placed with a relative caregiver. However, from the beginning of the case, this relative expressed hesitance regarding involvement with respondent. The caregiver would not permit respondent in her home and did not supervise visits. Respondent was clear in the beginning that she did not approve of the placement. Respondent contends that other relatives or third parties could supervise her continued visits with the children in the community; yet, respondent historically has not been able to get along with her adoptive family members and fails to explain how this situation could work. As aptly described by the circuit court:

> I don't sense that any type of guardianship would be an effective means of having these children in a . . . stable environment where . . . they're raised, in a guardianship, it would drama [sic] from day one. . . . I don't feel, even though the

minor children are in a relative placement that that's a viable solution taking their ages and their need for permanence into account.

The record evidence more than adequately supports the circuit court's conclusion.

We affirm.

/s/ Jane E. Markey
/s/ Elizabeth L. Gleicher
/s/ Michael J. Kelly