*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* B. M. SMITH, Minor.

UNPUBLISHED
February 10, 2022

No. 356619
Gogebic Circuit Court
Family Division
LC No. 19-000002-NA

Before: GLEICHER, C.J., and SERVITTO and LETICA, JJ.

PER CURIAM.

Respondent appeals as of right the trial court order terminating his parental rights to his minor child. We affirm.

Petitioner, the Department of Health and Human Services (DHHS), initiated proceedings concerning the minor child, BS, primarily due to domestic violence between the parents, respondent's mental health instability, and threats of harm to the child.[1] Petitioner presented evidence that respondent was physically abusive toward BS's mother and BS, was also verbally abusive toward BS, and had severe problems controlling his anger. Respondent participated in some therapy but eventually became angry with his therapist and quit. At a termination trial the court concluded, among other things, that respondent had not resolved his issues and that it would be traumatic for BS to be in any further contact with respondent. The trial court thus terminated respondent's parent rights to BS under MCL 712A.19b(3)(c)(*i*) (conditions leading to adjudication continue to exist), (g) (failure to provide proper care or custody), and (j) (likelihood of harm).

On appeal, respondent first argues that the trial court failed to make a proper determination regarding whether BS was eligible for membership in the Lac du Flambeau Indian Tribe. "Issues involving the application and interpretation of [the Indian Child Welfare Act (ICWA), 25 USC 1901 *et seq*.,] are questions of law that are reviewed de novo. A court's factual findings underlying

---

[1] Petitioner also sought termination of mother's parental rights but the trial court ultimately declined to terminate her rights. Because mother is not part of this appeal, allegations and concerns with respect to mother's parenting are not addressed.

the application of legal issues are reviewed for clear error." *In re Morris*, 491 Mich 81, 97; 815 NW2d 62 (2012).

When a child is Native American, provisions of the ICWA and the Michigan Indian Family Preservation Act (MIFPA), MCL 712B.1 *et seq*., are triggered. These statutes impose certain requirements for terminating parental rights to an Indian child—such as proof of "active efforts" to prevent the breakup of the family and proof beyond a reasonable doubt that continued parental custody of the child would harm the child. See *In re England*, 314 Mich App 245, 259; 887 NW2d 10 (2016).[2]

MCL 712B.3(k) states, in part:

"Indian child" means an unmarried person who is under the age of 18 and is either of the following:

(*i*) A member of an Indian tribe.

(*ii*) Eligible for membership in an Indian tribe as determined by that Indian tribe.

Respondent focuses on appeal on the Lac du Flambeau Tribe.[3] The trial court, in its opinion and order terminating respondent's parental rights, detailed the repeated attempts by the court and DHHS to get a response regarding membership eligibility from this tribe[4] and stated that "there is no evidence to indicate that [BS] is eligible for membership in any tribe."

In *In re Morris*, 491 Mich at 123, the Court, analyzing two separate lower court cases, stated:

On remand, the trial courts shall first ensure that notice is properly made to the appropriate entities. If the trial courts conclusively determine that ICWA does not apply to the involuntary child custody proceedings—because the children are not Indian children *or because the properly noticed tribes do not respond within the allotted tim*e—the trial courts' respective orders terminating parental rights are reinstated. If, however, the trial courts conclude that ICWA does apply to the child custody proceedings, the trial courts' orders terminating parental rights must be vacated and all proceedings must begin anew in accord with the procedural and substantive requirements of ICWA. [Emphasis added.]

The court gave statutory notice here to the Lac de Flambeau Tribe, and respondent does not contend that it was defective. See MCL 712B.9(2). The tribe did not respond within the allotted

---

[2] The *In re England* Court, in discussing these requirements, stated that "the relevant provisions of the ICWA and the MIFPA are essentially identical[.]" *Id*. at 259.

[3] Two other tribes determined that BS was not eligible for membership.

[4] The tribe had definitely been contacted, but it did not provide any response.

time and apparently has not responded to this day. Respondent makes no argument on appeal and provides no evidence that BS was, in fact, eligible for membership in the Lac du Flambeau Tribe.[5] Thus, no error is apparent with respect to the trial court's determinations that BS was ineligible for membership in an Indian tribe.

Respondent next contends that the trial court erred in its findings regarding statutory grounds for termination. We disagree.

To terminate parental rights, the trial court must find, by clear and convincing evidence, the existence of a statutory ground for termination. MCL 712A.19b(3). This Court reviews for clear error the trial court's factual findings and its ultimate determination that a statutory ground has been established. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010); *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). A finding is clearly erroneous if, even if some evidence supports the finding, the reviewing court is nevertheless left with the firm and definite conviction that the lower court made a mistake. *In re Mason*, 486 Mich at 152.

MCL 712A.19b(3) states, in relevant part:

The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

* * *

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds . . . the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

* * *

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.[6]

---

[5] Also, at the emergency-removal hearing, the court asked if an Indian child was at issue. Counsel for petitioner stated, "I don't believe that this child ha[s] Native American heritage." The court asked respondent if he or BS was affiliated with an Indian tribe, and respondent replied, "No." It asked mother if she was affiliated with an Indian tribe, and she answered, "No." It was not until termination became a possibility that respondent raised the tribe issue.

[6] Subparagraph (g) was amended by 2018 PA 58, effective June 12, 2018, to add the language about finances.

\* \* \*

      (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

On April 30, 2019, respondent pleaded no contest to a March 19, 2019 petition, which also incorporated a petition filed on January 11, 2019. Among the allegations in the petitions were the following: respondent had choked BS and sworn at her, respondent had threatened to kill himself and BS's mother, respondent had threatened to kill BS, respondent had committed domestic violence against mother and BS, and respondent had refused services. Thus, the primary conditions leading to adjudication were respondent's poor mental health, his anger, and his perpetration of domestic violence.

Respondent's anger problems persisted throughout the case. For example, in April 2019, respondent became frustrated and was using profanity in front of BS, and the visitation supervisor had to ask him to leave. The supervisor testified that respondent did not have control of his emotions and stated that in 30 years of supervising visitations, she had never seen an incident where things "spiraled" so badly. Respondent was using the "f" word and, when asked not to, he just used it more. He said that he was going to go home and kill himself. A subsequent parenting time supervisor received "seven very angry texts" from respondent. Respondent stated in the texts that "everyone needs to watch their back" and that he did not recognize DHHS's authority. The texts were described as "violent." The latest caseworker testified that respondent had mental health needs and had not completed his services for them. He had had approximately 22 counseling sessions but stopped around November 2020. When his counselor told respondent that he needed to change some things in his life, respondent became very angry with him, "hung up," and ceased contact. He refused to see an alternate provider. Respondent blamed DHHS for his problems, and the caseworker did not think that he had made progress with his mental health. At the end of November 2020, he said that he was physically sick and that DHHS was killing him; he implied that he could only get better with the help of BS's mother. The caseworker was concerned that after 22 counseling sessions, respondent still could not manage his life. She did not know what else could be done to help his mental health. Respondent had never acknowledged to her that he had a problem with domestic violence. She did not believe that the domestic violence issue had been resolved or that respondent had benefited from his counseling.[7]

Although respondent attended some counseling sessions, participation in services is not sufficient; the salient goal is for a respondent to demonstrate a lasting *benefit* from the services. See, e.g., *In re Olive/Metts Minors*, 297 Mich App at 43. Given the evidence provided, the trial court did not clearly err by concluding that respondent did not benefit from services enough such that the domestic violence and anger issues were resolved or would be resolved within a reasonable time considering BS's age. Clear and convincing evidence established MCL 712A.19b(c)(*i*).

---

[7] Also, the court made note of respondent's outbursts in the courtroom.

In addition, respondent had failed to provide proper care or custody to BS in the past, for reasons related to domestic violence, i.e., for reasons unrelated to finances.[8] MCL 712A.19b(g). And again, the court did not clearly err by concluding that respondent did not demonstrate that he could resolve the domestic violence issue in a reasonable time considering BS's age.

As for MCL 712A.19b(j), there was ample evidence to support the trial court's finding that BS was likely to be harmed, either physically or psychologically, if returned to respondent's care. In addition to evidence pertaining to the unresolved issues involving anger and domestic violence, there was evidence that respondent was "out of it" and disengaged during many visitations and that he was supposed to use books and videos for parenting education but only used the videos. Moreover, BS's counselor said that BS had trouble with encountering men and seemed to fear them. When told that she had to do a trauma assessment with respondent after not having seen him in some time, BS did not want to go, hid under a table, and had a urine accident. The counselor described the scene as "heartbreaking." The foster mother agreed that BS was extremely opposed to seeing respondent again for the trauma assessment. According to her, BS said, " '[N]o daddy,' " "pee[d] her pants," and got bright red with dripping sweat. She expressed fear that her father would take her, and it took hours for her to calm down. BS vomited twice on the way to the assessment and later said, " '[D]addy hit.' " Her behavior worsened after the assessment. The evidence demonstrated that being returned to respondent's care would be very detrimental, either physically or psychologically, or both, to BS. Thus, the trial court did not clearly err by finding that the statutory basis for termination in MCL 712A.19b(3)(j) had been established by clear and convincing evidence.

"If a trial court finds that a statutory basis for terminating parental rights exists by clear and convincing evidence, it is required to terminate parental rights if it finds from a preponderance of evidence on the whole record that termination is in the [child's] best interests." *In re Brown/Kindle/Muhammad Minors*, 305 Mich App 623, 637; 853 NW2d 459 (2014) (quotation marks and citation omitted); see also MCL 712A.19b(5). We review for clear error the court's decision regarding the child's best interests. *In re Olive/Metts Minors*, 297 Mich App at 40.

> The trial court should weigh all the evidence available to determine the [child's] best interests. To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the [child's] well-being while in care, and the possibility of adoption. [*In re White*, 303 Mich App 701, 713-714; 846 NW2d 61 (2014) (quotation marks and citations omitted.]

The evidence as discussed in connection with the statutory grounds also supported the trial court's finding regarding best interests. It was not in BS's best interests to return her to a parent who had

---

[8] The court noted that "[t]he historical concerns as to improper care and supervision are not financial in nature."

not adequately addressed his problems with anger and domestic violence, who could not properly care for BS, and who would likely cause her great physical and/or psychological harm.

Respondent also contends that the trial court, after suspending parenting time, should have reinstated it after receiving the trauma assessment report because in the report it was noted that respondent was interacting appropriately with BS. He contends that the continued suspension of his parenting time amounted to a constitutional due-process violation.

After the court suspended parenting time at the January 28, 2020 hearing, the trauma assessment took some time to be completed, with some delays attributable to the COVID-19 pandemic. The trauma assessment report was finally completed on September 25, 2020. At the next review hearing, in October 2020, respondent's attorney said, "I can understand that parenting time isn't going to start until after the termination hearing." Notably, respondent's attorney argued that BS did not have a lot of trauma associated with seeing her parents, but he did not ask for a renewal of parenting time. He only said, "I have no objection to her mother seeing her."

In addition, no constitutional due-process issue was raised below. The present issue is thus not preserved. Cf. *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008).[9] This Court reviews unpreserved issues for plain error affecting substantial rights. *Id*. As noted in *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999), under the plain-error doctrine, even if a plain (i.e., a "clear or obvious") error occurs, reversal is not warranted unless the plain error "affected substantial rights," i.e., "affected the outcome of the lower court proceedings." And even if this standard is satisfied,

> an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence. [*Id*. at 763-764 (citation, quotation marks, and brackets omitted).]

On January 28, 2020, the caseworker reported that BS was doing well in her placement but was waking up in the night or during naps saying, " '[D]addy mean.' " This was happening more frequently before or after a parental visitation. The caseworker testified that respondent was not attending any counseling and had missed eight visitations. On two of the visits, BS did not "want anything to do with" respondent. The guardian ad litem and DHHS desired a goal change to termination. The guardian ad litem noted that BS was experiencing signs of extreme trauma in connection with parenting time and that these signs had lessened when respondent's parenting time had been temporarily suspended earlier in the case. The court stated that DHHS could pursue a goal change to termination. It suspended visitations and recommended a trauma assessment for BS.

Respondent argues that because the trauma assessment summary, dated September 25, 2020, showed that he had appropriate interactions with BS, the court should have reinstated parenting time. However, testimony established that BS was *extremely* traumatized at the idea of

---

[9] It would not warrant reversal even if it had been preserved.

seeing respondent during the assessment. She even vomited twice on the way to the assessment and later said, " '[D]addy hit.' " And her behavior worsened for weeks after the assessment. The trial court acted well within its rights and duties by continuing the suspension of parenting time. See MCL 712A.19b(4) ("If a petition to terminate parental rights to a child is filed, the court may suspend parenting time for a parent who is a subject of the petition.").

In making his due-process argument, defendant cites cases such as *In re B & J*, 279 Mich App 12, 19; 756 NW2d 234 (2008), wherein the Court stated, "Petitioner was not entitled to seek termination of respondents' parental rights under § 19b(3)(g) in this case because petitioner, itself, intentionally set out to create that very ground for termination." The Court concluded that this amounted to a due-process violation. *Id*. at 19-20. The present case is not at all analogous.

In *In re B & J*, *id*. at 15, the petitioner had reported the parents to immigration services such that they were removed from the country. Here, the trial court was authorized by statute to continue the suspension of parenting time, MCL 712A.19b(4), and it also had factual reasons for doing so. The absence of parenting time from September 25, 2020, to the time of termination did not create a ground for termination. No clear error—and certainly no plain error—is apparent.

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Deborah A. Servitto
/s/ Anica Letica