*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* N. S. DOTY, Minor.

UNPUBLISHED
April 14, 2022

No. 358116
Isabella Circuit Court
Family Division
LC No. 2019-000139-NA

*In re* R. J. THOMPSON, Minor.

No. 358190
Isabella Circuit Court
Family Division
LC No. 2019-000124-NA

*In re* DOTY/THOMPSON, Minors.

No. 358191
Isabella Circuit Court
Family Division
LC No. 2019-000139-NA

Before: RONAYNE KRAUSE, P.J., and MURRAY and O'BRIEN, JJ.

PER CURIAM.

Respondent-mother and respondent-father appeal as of right orders terminating their parental rights. The trial court terminated respondent-mother's parental rights to four children, ND, AT, ET, and RT, under MCL 712A.19b(3)(c)(*i*) (failure to rectify the conditions leading to adjudication), (g) (failure to provide proper care or custody), and (j) (reasonable likelihood of harm

-1-

to the child if returned to the parent). The court terminated respondent-father's parental rights to ND under MCL 712A.19b(3)(c)(*i*) and (g).[1] We affirm.

The three oldest children were placed into foster care in March 2019. Respondent-father and respondent-mother, who never married, were not living together or in a romantic relationship at the time. They were both using methamphetamine, and neither had an appropriate home for the children. The youngest child, RT, was born during the course of these proceedings and placed with his siblings in foster care shortly after his birth. The foster mother wanted to adopt all four children and had adequate resources to do so.

Respondent-mother struggled with a severe drug addiction throughout the proceedings—she was hospitalized multiple times for overdoses and was unable to maintain sobriety for any appreciable length of time during the case. Respondent-father was incarcerated for home invasion shortly after adjudication and remained incarcerated throughout the case, with an earliest release date of April 21, 2022.

I. DOCKET NOS. 358190 AND 358191

In Docket Nos. 358190 and 358191, respondent-mother contends that the lower court clearly erred when it found by clear and convincing evidence a statutory basis for terminating her parental rights to the children. We disagree.

To terminate parental rights, the trial court must find, by clear and convincing evidence, a statutory ground for termination. MCL 712A.19b(3). This Court reviews for clear error the trial court's factual findings and its ultimate determination that a statutory ground has been established. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). A finding is clearly erroneous if, even if some evidence supports it, the reviewing court is nevertheless left with the firm and definite conviction that the lower court made a mistake. *Id*.

MCL 712A.19b(3)(c)(*i*) states, in relevant part, that a "court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence," that:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds . . . the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

The initial dispositional order for the three oldest children in this case was entered in May 2019, the initial disposition order for RT was entered in November 2019, and respondent-mother's rights to all four children were terminated on July 23, 2021. Thus, by the time of termination,

---

[1] The fathers of ET and RT are unknown. The parental rights of the father of AT were terminated on the basis of abandonment, and he is not a party to these appeals.

more than 182 days had passed since the issuance of the initial dispositional orders. The remaining questions are whether the conditions that led to condition continued to exist at the time of termination, and whether there was a reasonable likelihood that they would be rectified within a reasonable time considering the child's age.

The conditions that led to adjudication of the three oldest children included that respondent-mother did not have adequate housing for the children; she had been using methamphetamine and tested positive for it on several occasions; and she tested positive for cocaine. The conditions that led to the adjudication of the youngest child, RT, included that respondent-mother had the three eldest children removed due to her struggles with substance abuse; she continued to struggle with sobriety and "had setbacks on her efforts to live a sober, substance free lifestyle"; she tested positive for methamphetamine at her latest drug test; and she did not have adequate housing.

By the time of the termination hearing, which took place over three days in March, April, and June 2021, respondent-mother continued to struggle with substance abuse and housing. For instance, on the second day of the termination hearing in April 2021, respondent-mother admitted that she was no longer welcome at the sober-living facility where she had been planning to stay and that she had been using methamphetamine. By the last day of the termination hearing in June 2021, respondent-mother claimed that she had been sober for 15 days. She stated that her drug screen from the prior day was clean, but she admitted to missing an earlier screen. She also admitted that she still did not have appropriate housing. With only 15 days of sobriety for a case that had been ongoing for almost two years for the three oldest children, and with still no adequate housing, we cannot conclude that the trial court clearly erred when it found by clear and convincing evidence that the conditions that led to adjudication continued to exist.

Focusing on respondent-mother's struggle with substance abuse, that barrier to reunification continued to exist despite the persistent efforts of the Department of Health and Human Services (DHHS)[2] to assist respondent-mother through numerous services designed to address her substance abuse. Each time the DHHS connected respondent-mother with services to help her address her substance abuse, respondent-mother either did not comply or complied for a short while before stopping the services and returning to her drug use.

In October 2019, the DHHS had scheduled an appointment for respondent-mother with Addiction Solutions, but respondent was a "no call, no show" for her appointment. Later in 2019, respondent-mother went to an inpatient facility in Alpena for three days, then to another facility in Freeland for two days, and she then entered a facility in Midland for three weeks, graduated on January 2, 2020, and moved to a sober-living facility called Sisters of Sobriety.

This progress, however, was unfortunately short-lived—after leaving Sisters of Sobriety on January 7, respondent-mother stopped participating in random drug-screens and never participated in outpatient substance-abuse counseling, despite directions to do so. When respondent-mother resumed participating in drug-screens, she tested positive for

---

[2] At times during the instant cases, foster-care services were contracted out to an organization called Eagle Village. For ease of reference, we simply refer to the DHHS in this opinion.

methamphetamine on January 14, 16, and 21, and failed to make mandatory call-ins (to see whether she was required to test on that particular day) on January 17, 18, and 19.

The DHHS then reconnected respondent-mother with services from Addictions Solutions, and she participated in those services for a time, but by the June 22, 2020 review hearing, the DHHS reported that respondent had been a "no call, no show" at her last two appointments. Drug screenings had been suspended for a period of time in 2020 due to the COVID-19 pandemic, but when they resumed in June 2020, respondent-mother tested positive for THC (tetrahydrocannabinol) on June 2 and positive for methamphetamine on June 16. Later, on July 15, respondent-mother tested positive for methamphetamine, THC, cocaine, fentanyl, and opiates, and on both August 12 and 19, she tested positive for methamphetamine, amphetamine, and fentanyl. Despite these positive tests, respondent-mother was refusing the DHHS's efforts to connect respondent-mother with an inpatient treatment center.

At a September 2020 review hearing, the DHHS requested that the goal be changed from reunification to termination, but the trial court denied the request, deciding to give respondent-mother another chance to get clean at an inpatient facility. Respondent-mother did not take advantage of this opportunity, however. By the time of the December 2020 review hearing, respondent-mother had not called into the random-drug-screening hotline since August 30, and on that day, she had tested positive for methamphetamine. While respondent-mother had checked into an inpatient facility at some point prior to the December 2020 hearing, she checked herself out of the facility "against medical advice," and overdosed on heroin shortly thereafter.[3] She then checked herself back into the inpatient facility, but again checked herself out against medical advice, evidently because she wanted to be with her boyfriend.

Thereafter, the trial court changed the goal from reunification to termination, and the termination hearing commenced in March 2021. At the first day of the hearing, respondent-mother appeared to be making progress, stating that she was currently residing in an inpatient facility and had been clean for almost 60 days. But this progress was, unfortunately, short-lived, and by the time that the hearing resumed in April 2021, respondent-mother admitted—as previously explained—that she was no longer welcome at the sober-living facility where she had been planning to stay and that she had been using methamphetamine. Again, by the time of the June 2021 termination hearing, respondent-mother claimed that she was participating in outpatient substance-abuse treatment and had been sober for 15 days.

On this record, it is clear that, despite the DHHS's extensive efforts to assist respondent-mother with her struggles with substance abuse, respondent-mother failed to make significant progress towards rectifying the barrier. Every time respondent-mother seemed to be making progress towards rectifying her substance abuse, she relapsed and was setback on her path to sobriety. By the last day of the termination hearing, the three oldest children had been in foster care for over two years and the youngest child had been in foster care for over 1½ years. In light of respondent-mother's track record of failing to adequately address her issues with substance

---

[3] Respondent-mother was hospitalized four or five times for heroin overdoses since March 2019, with two or three of them taking place after November 9, 2020.

abuse, the trial court did not clearly err by concluding that there was no reasonable likelihood that this condition would be rectified within a reasonable time considering the children's ages. Accordingly, the trial court did not clearly err when it found by clear and convincing evidence that termination was proper under MCL 712A.19b(c)(*i*).[4] Because only one ground for termination need be established, we decline to address whether termination was proper under the remaining grounds found by the trial court. *In re Schadler*, 315 Mich App 406, 410; 890 NW2d 676 (2016).

Respondent-mother also contends, in a single sentence in her appellate brief, that "the court's determination to terminate the parental rights of [respondent-mother] was not in the children's best interest." This lack of analysis is inadequate to bring the issue before the Court, and respondent-mother also failed to properly present the issue for review by including the issue in her statement of questions presented. See *Wilson v Taylor*, 457 Mich 232, 243; 577 NW2d 100 (1998) (explaining that "a mere statement without authority is insufficient to bring an issue before this Court"); *Bouverette v Westinghouse Elec Corp*, 245 Mich App 391, 404; 628 NW2d 86 (2001) ("Independent issues not raised in the statement of questions presented are not properly presented for appellate review.").

Regardless, addressing the issue, the trial court did not clearly err by finding that termination of respondent-mother's parental rights was in the children's best interests. "If a trial court finds that a statutory basis for terminating parental rights exists by clear and convincing evidence, it is required to terminate parental rights if it finds from a preponderance of evidence on the whole record that termination is in the children's best interests." *In re*

---

[4] The court stated that this was one of the worst drug-addiction cases it had seen and that at each hearing the court was hoping that respondent-mother was still alive. We note that respondent-mother, in the course of her briefing related to statutory grounds for termination, implies that the DHHS was not proactive in attempts at reunification. This argument is not properly presented for appeal because it is not included in the statement of questions presented. See *Bouverette v Westinghouse Elec Corp*, 245 Mich App 391, 404; 628 NW2d 86 (2001). At any rate, the argument is without merit; respondent-mother was provided with services time and time again and given many chances at sobriety. The court, at one point, even denied the DHHS's request to file a termination petition in order to give respondent-mother more time to demonstrate sobriety. The issue in this case was not a lack of efforts by the DHHS, but respondent-mother's failure to benefit from the services offered. See *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012) ("While the [DHHS] has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered.").

We also acknowledge that, in her brief on appeal, respondent-mother repeatedly emphasizes that, since the termination of her parental rights, she has maintained her sobriety for more than five months. While we do not wish to in any way diminish respondent-mother's remarkable progress if true, we are unable to consider this information because it is not part of the record, and it would not otherwise be a reason to rule that it was improper for the trial court to terminate respondent's parental rights on the record that was before the court. See *In re Harper*, 302 Mich App 349, 360 n 3; 839 NW2d 44 (2013) (explaining that "[t]his Court's review is limited to the record established by the trial court") (quotation marks and citation omitted).

*Brown/Kindle/Muhammad Minors*, 305 Mich App 623, 637; 853 NW2d 459 (2014) (quotation marks and citation omitted); see also MCL 712A.19b(5). This Court reviews for clear error a lower court's decision that termination is in a child's best interests. *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012).

> The trial court should weigh all the evidence available to determine the children's best interests. To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*In re White*, 303 Mich App 701, 713-714; 846 NW2d 61 (2014) (quotation marks and citations omitted).]

The children had been together in the same foster home for a lengthy period. They were doing well and were "very happy" there, and the foster mother, who had a large, stable home; a stable, flexible job; and family support, wanted to adopt all four children. She was also open to the idea of allowing respondent-mother to visit when appropriate. Under these circumstances, and given respondent-mother's failure to rectify her issues and the children's need for stability, the court did not clearly err by finding that it was in the children's best interests to terminate respondent-mother's parental rights.

## II. DOCKET NO. 358116

In Docket No. 358116, respondent-father contends that the DHHS failed to provide reasonable efforts at reunification. He claims that he should have been provided a parent-agency treatment plan (PATP) that gave him services to complete while in prison. This Court reviews the question of reasonable efforts for clear error. See *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005).

As an initial matter, respondent-father's briefing is inadequate. He does not provide a single legal authority in support of his two-paragraph argument that the DHHS did not provide reasonable efforts toward reunification. In *Wilson*, 457 Mich at 243, the Court stated:

> [A] mere statement without authority is insufficient to bring an issue before this Court. It is not sufficient for a party simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position. Accordingly, we need not address this issue, and therefore, decline to do so. [Quotation marks and citations omitted.]

Due to respondent-father's failure to adequately brief this issue, we need not even address the issue raised. Nevertheless, we will do so for the sake of completeness.

With certain exceptions not applicable here, the DHHS is required to make reasonable efforts to reunify a family after removing a child from his or her home. *In re Rippy*, 330 Mich

App 350, 355-356; 948 NW2d 131 (2019). "And termination is improper without a finding of reasonable efforts." *In re Hicks/Brown*, 500 Mich 79, 90; 893 NW2d 637 (2017).

Respondent-father argues that he "was entitled to a case treatment plan to be provided by [the] DHHS that would identify and set specific goals and objectives for him to complete during incarceration." But the DHHS was limited regarding what services it could provide to someone in prison, and respondent-father does not explain on appeal what additional services could have been provided. Again, an appellant may not leave it to this Court to unravel for him his arguments. *Wilson*, 457 Mich at 243.

The caseworkers who assisted respondent-father appeared to do as much as they could under the circumstances. One caseworker, CB, said that she had sent respondent-father monthly letters with paper and envelopes so that he could write letters to ND, and that he had signed a PATP that the worker sent to him. Respondent-father also had weekly telephone visitations with ND for much of the duration of the case. Respondent-father admitted having signed and discussed PATPs and admitted to getting documents from CB around once a month. He was also sent, and completed, parent-education questionnaires. He admitted to always being able to participate in the court hearings. He said that he had done a "career scope" class while in prison, but that he was not likely to start other classes until closer to his earliest release date because of prison regulations. CB said that she spoke with prison employees on a couple of occasions to try to get respondent-father into services. Respondent-father admitted that CB had sent him a letter inquiring about his plans for release, but he had not replied to that or certain other communications. In addition, respondent-father had been provided with services at the initiation of the case before his incarceration, but he did not adequately participate in them.

Under these circumstances, we are not left with the firm and definite conviction that the trial court made a mistake by finding that the DHHS expended reasonable efforts toward reunification. *In re Mason*, 486 Mich at 152.

Although respondent-father does not say so on appeal, he may be attempting to make an argument that, under *In re Mason*, the court improperly terminated his parental rights on the basis of his incarceration. In *In re Mason*, our Supreme Court stated that "[t]he mere present inability to personally care for one's children as a result of incarceration does not constitute grounds for termination." *Id*. at 160. The present case, however, differs from *In re Mason* in key respects. First, respondent-father's adjudication occurred not because of incarceration but because of his methamphetamine use and a lack of housing. He was not incarcerated until after the children were placed into foster care and he had started receiving services. Cf. *In re Mason*, *id*. at 147.

Also, in *In re Mason*, the Court emphasized that the respondent's parenting ability was never evaluated because he was never allowed to participate in the case. *Id*. at 162, 166. Here, in contrast, respondent-father had counsel and participated in every hearing and was provided services as discussed above. Respondent-father said he would take parenting classes to prove that he wanted his daughter back, but he also said that he did not really need them because he knew he was a great father when not using drugs. In the spring of 2021, CB wanted to facilitate supervised telephone visitations with ND, but respondent-father never called CB to arrange the visits. Also, CB testified that respondent-father never communicated to her about any family members that he would like to look after ND. In addition, respondent-father admitted to not reading highly relevant

parts of the PATP and just signing something because he thought he had to.[5]  Concerningly, he said that he never read sections pertaining to barriers for reunification.  And, significantly, he never responded to CB's inquiries about housing and employment after his release from prison.  As noted, he *admitted* that CB had sent him a letter inquiring about his plans for release and that he had not replied to that or other communications.

While he attempted to show on the final day of the termination hearing that his sister would care for ND and that he would have employment upon his release from prison, he did not communicate such things to the DHHS in a timely fashion.[6]  He did not pursue a guardianship for ND like he had for another child of his.  The trial court, as the arbiter of the credibility, see *In re HRC*, 286 Mich App 444, 459; 781 NW2d 105 (2009), specifically concluded that respondent-father's sister's testimony about having been willing to care for ND was not credible.

For all these reasons, the present case is readily distinguishable from *In re Mason*.

Affirmed.


/s/ Amy Ronayne Krause
/s/ Christopher M. Murray
/s/ Colleen A. O'Brien

---

[5] It is clear from various parts of the record that respondent-father, despite his attorney's attempt to insinuate otherwise, was literate and could write and understand the English language.  Also, respondent-father admitting knowing that he could ask for explanations for anything he did not understand.

[6] In the meantime, ND had become bonded to all her siblings that were in the foster home and expressed a desire to be with them.