*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* COLLINS/LOZANO, Minors.

UNPUBLISHED
August 17, 2023

No. 365129
St. Clair Circuit Court
Family Division
LC No. 20-000057-NA

Before: O'BRIEN, P.J., and CAVANAGH and MARKEY, JJ.

PER CURIAM.

This is the second time that this case has been before this Court. In respondent's first appeal, a panel of this Court vacated the order terminating respondent's parental rights to the minor children, EC, HL, and LL, and remanded for the trial court to address how the termination was consistent with *In re Jackisch/Stamm-Jackisch*, 340 Mich App 326; 985 NW2d 912 (2022), which was released after the trial court issued its original ruling. *In re Collins/Lozano Minors*, unpublished per curiam opinion of the Court of Appeals, issued December 15, 2022 (Docket No. 359018 and 359019), p 9. On remand, the trial court complied with this Court's order by explaining on the record why its prior ruling was consistent with *In re Jackisch*, and again entered an order terminating respondent's parental rights to the minor children under MCL 712A.19b(3)(c)(*i*), (g), and (j). Respondent now appeals that order as of right. We affirm.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

This case began in January 2020 when Children's Protective Services (CPS) received a complaint regarding respondent and her boyfriend, AL, who was HL's and LL's father.[1] The complaint related to potential physical neglect, improper supervision, and domestic violence between the adults in the presence of the children. A CPS worker conducted an unannounced home visit to investigate the allegations. The CPS worker observed marijuana,[2] pill bottles, and

---

[1] AL's rights to HL and LL were previously terminated by the trial court in this case, and that order was affirmed on appeal. See *In re Collins/Lozano Minors*, unpub op at 4-6. EC's father has never been a party to these proceedings.

[2] Respondent had a medical-marijuana card.

kitchen chemicals stored in reach of the children, who were unsupervised. The worker also observed that LL, who was an infant at the time, was left unattended in a bouncer with a bottle propped up in his mouth. Respondent denied any domestic violence, however.

Another CPS complaint was received for similar reasons in February 2020. The same CPS worker returned to respondent's home to investigate this second complaint, and this time observed a broken window, which appeared to be broken from the inside. The worker believed that this was consistent with domestic violence. Respondent, however, again denied any domestic violence and claimed instead that a chair was somehow pushed into the window and broke it. The worker also observed LL in a similar position during this home visit, and noticed that respondent's marijuana was still out and reachable by the children.

In this Court's previous opinion, it described the facts occurring after the February 2020 home visit as follows:

After an in-home wardship, [petitioner, the Department of Health and Human Services] sought to remove the children from respondent['s] home, citing a domestic violence incident in which [AL] struck respondent[] in the head three times, and an unannounced home visit that revealed marijuana and marijuana paraphernalia within reach of the children. [Petitioner] also alleged that respondent[] had hit EC in the head with an electric cord.

The court exercised jurisdiction over the minor children. During the review period, respondent[ and AL] progressed with their respective service plans to the point that the caseworkers considered unsupervised visitations. In mid-April 2021, however, respondent[ and AL] were involved in another altercation during a party. [AL] became jealous and emotional after respondent[] rode a "four wheeler" with another man, and told respondent[] they had to leave the party. Respondent[ and AL] got into [AL]'s truck. Although [AL] disputes whether he touched respondent[], he acknowledged at the termination hearing that he punched the steering wheel and ripped off the rear-view mirror. Then, when respondent[ and AL] returned home, [AL] punched a mirror and knocked over a television. [AL] was criminally charged, but the prosecutor dismissed the case after respondent[] and another witness declined to testify at trial.

The caseworker, Courtney Rawlins, of Ennis Center, reported to the trial court that she saw respondent[ and AL] together at a gas station in early July 2021, despite the April 2021 incident. At the time, [AL] had a no-contact order as part of the then-pending criminal case, but respondent[] was not bound by the order. The July 2021 sighting of respondent[ and AL] together led [petitioner] to request termination of both respondent['s and AL's] parental rights.

Rawlins did not testify at the termination hearing, but her supervisor, Tabitha Appledorn, testified regarding what Rawlins saw in July 2021. Appledorn also testified that respondent[] had regressed with regard to her parenting skills and the condition of her home after the April 2021 incident. The court terminated both

respondent['s and AL's] parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j). [*In re Collins/Lozano*, unpub op at 2-3.]

This Court's opinion provided further information about the reasons the trial court cited for terminating respondent's parental rights while analyzing whether the decision was proper, stating:

[Petitioner] argued, at the termination hearing, that the primary reason it sought termination for respondent[] was because Rawlins saw respondent[ and AL] together in early July 2021. [Petitioner] argued that the fact that respondent[] continued to interact with [AL], even after the April 2021 incident, showed that she had not benefitted from services and that there was a reasonable likelihood she would place the children in harm's way. . . .

Regardless, Rawlins's sighting of respondent[] and [AL] together in July 2021 was not a sufficient reason to terminate respondent[]'s parental rights. We note that [AL] was ordered not to have contact with respondent[] as a condition in the criminal case arising from the April 2021 incident. Respondent[] had no reciprocal requirement until mid-July 2021, approximately a week after the gas-station sighting. The April 2021 incident occurred nearly a year after the initial domestic-violence incident that led to adjudication, which involved [AL] striking respondent[] in the head three times. It was also after both respondent[ and AL] successfully participated in services. Appledorn testified that respondent[] indicated, in May 2021, that she wanted to get back together with [AL], but that was nearly two months before the trial court ordered her to have no contact with [AL] (and four months before the termination hearing). There was no evidence that respondent[] violated the no-contact court order after it was entered in mid-July 2021, or that she physically abused the children. Instead, the trial court appears to have speculated that respondent[] would remain in an abusive relationship with [AL] despite the no-contact order. . . .

Although [AL]'s aggressive and threatening behavior was the primary reason [petitioner] sought termination, there were other issues leading to termination including the conditions of respondent[]'s home, her marijuana use, and her parenting-time behavior. . . .

We note that the caseworker varied in how she described respondent[]'s progress with the treatment plan. At first, Appledorn testified that respondent[] had improved to the point that the agency, Ennis Center, was considering unsupervised visitations. As Appledorn testified, "They were in compliance with all of the case services until the domestic violence incident. We were actually going to go to unsupervised visits with the parents until that happened in April." Then, when asked if respondent[] had completed all of the recommended services, Appledorn replied, "That is absolutely correct." Specifically, respondent[] completed parenting classes, life-skills classes, psychological counseling, a substance-abuse evaluation, and drug testing, and obtained employment and housing. Yet, Appledorn also testified that respondent[] was inattentive during more recent

-3-

parenting-time visits. Respondent[] took her cell phone into the bathroom during one virtual visit with the children. Appledorn testified that respondent[] had regressed with regard to the condition of her home, and the amount of clutter in the home was inappropriate. But Appledorn acknowledged that respondent[] had, at times, improved the condition of her home. Appledorn also indicated that, at the time of her testimony, she had not seen respondent[]'s home in nearly three months. Finally, Appledorn testified that respondent[], who had a valid medical-marijuana card, continued to keep open marijuana in the home, despite having access to a locked box. Respondent[] tested positive for cocaine in early 2021, but had not tested positive for any drugs other than marijuana since that time. [*In re Collins/Lozano*, unpub op at 7-8.]

Respondent appealed the order terminating her parental rights, and this Court expressed concern about the trial court's apparent reliance on respondent being a victim of domestic violence as a reason for termination, which would violate *In re Jackisch*. *In re Collins/Lozano*, unpub op at 7-8. Consequently, out of an abundance of caution, this Court vacated the order of termination and remanded for the trial court to explain whether its decision violated the relevant caselaw, and if so, what other grounds the trial court relied on when terminating respondent's parental rights. *Id*. at 8-9.

On remand, the trial court heard additional arguments from the parties, but no additional evidence or testimony was accepted. After hearing the parties' arguments, the trial court concluded that it had not considered respondent's status as a victim of domestic violence as a reason to terminate her parental rights. The court clarified that it instead terminated respondent's parental rights based on her conduct of exposing the children to domestic violence, and her expressed intent to continue doing so. The trial court emphasized that the children's previous exposure to domestic violence had led them to develop behavioral problems that already required counseling, and concluded that continued exposure to domestic violence would cause the children additional harm. The trial court also reiterated the other grounds on which it relied for termination, and referenced its previous analysis related to best interests. The trial court then entered another order terminating respondent's parental rights under the same statutory grounds.

This appeal followed.

## II. STATUTORY GROUNDS

Respondent contends that the trial court clearly erred when it found that petitioner established a statutory ground for termination by clear and convincing evidence. We disagree.[3]

---

[3] We acknowledge that the prior panel in this case retained jurisdiction, and, after the trial court issued its order clarifying its reasons for terminating respondent's parental rights, the panel issued an order dismissing the appeal as moot. *In re Collins/Lozano Minors*, unpublished order of the Court of Appeals, entered February 13, 2023 (Docket No. 359019). Neither party argues that consideration of statutory grounds is barred under the law-of-the-case doctrine in light of the prior

## A. STANDARD OF REVIEW

"We review the trial court's determination of statutory grounds for clear error." *In re Sanborn*, 337 Mich App 252, 272; 976 NW2d 44 (2021). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Id.* at 272-273 (quotation marks and citation omitted).

## B. ANALYSIS

" 'To terminate parental rights, a trial court must find that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been proved by clear and convincing evidence.' " *In re Brown/Kindle/Muhammad Minors*, 305 Mich App 623, 635; 853 NW2d 459 (2014), quoting *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011). "The fact that respondent was or is a *victim* of domestic violence may not be relied upon as a basis for terminating parental rights." *In re Jackisch,* 340 Mich App at 334. "This is not to say that being a victim of domestic violence necessarily precludes termination of parental rights." *Id.* A parent's conduct that directly harmed the children or exposed the children to harm can always be relied upon by a trial court as a basis for terminating parental rights, even if that parent was also a victim of domestic violence. *Id.*

The trial court did not clearly err when it found that respondent's behaviors were exposing the children to harm. The record showed that respondent and AL had a lengthy history of issues related to domestic violence. This case was initiated in January 2020 after CPS received a complaint that AL committed an act of domestic violence against respondent. Respondent denied such occurred at the time, but the record established that it was common for her to lie about instances of domestic violence. Another allegation of domestic violence was reported to CPS in February 2020, which resulted in a second home visit. That visit revealed that a window in respondent's home was broken from the inside. Respondent again denied domestic violence, claiming that a chair was pushed into the window and broke it. Petitioner eventually sought removal of the children from respondent's care in April 2020 after a third instance of domestic violence was reported. Once again, respondent denied the event, but she eventually agreed that it happened when pleading to the allegations in the amended complaint. Pertinently, respondent pleaded to AL striking her head three times during a dispute.

After about 15 months of the children being in care, respondent had completed an array of services offered by petitioner. Some of these included instruction on how to deal with domestic violence. Respondent also was aware that the children being exposed to domestic violence was one of the reasons her children had been removed from her care. Nevertheless, in April 2021,

---

panel's opinion and subsequent orders. See *Rott v Rott*, 508 Mich 274, 286-287; 972 NW2d 789 (2021) (explaining the law-of-the-case doctrine). Accordingly, we proceed with the understanding that consideration of this issue is not barred by the law of the case. We nevertheless note that regardless of whether we address respondent's statutory-grounds argument or consider the argument already decided under the law of the case, the outcome is the same.

respondent called police after she was again assaulted by AL. She told Officer Keri Duva of the St. Clair County Sheriff's Office that AL likely punched her with a closed fist because this was the manner in which he usually assaulted her. Plainly, this was respondent admitting to a history of domestic violence to the point that she was aware of the typical manner in which AL struck her. Respondent's friend, who was present when the assault occurred, told Officer Duva that respondent claimed AL choked respondent on the night in question, causing her neck to hurt.

By May 2021, respondent was expressing regrets about contacting police about the April assault because she wanted to rekindle her relationship with AL. Relevantly, on May 10, 2021, respondent told Rawlins that "she was doing whatever possible to get [AL] back." Rawlins spoke to respondent about the issue again on June 11, 2021, and respondent "reported that she wants [AL] back no matter what." Rawlins cautioned respondent about her position, explaining "that due [to] domestic violence being part of the reason the children came into [care], that this could possibly be a reason to request to file a termination petition." Likewise, when respondent informed Appledorn of her desire to restart her relationship with AL in June 2021, Appledorn told respondent that such could result in the termination of her parental rights. In response, however, respondent simply reiterated that she would do anything to get AL back in her life. Respondent followed through on her claims by meeting with AL in July 2021. Although there was no court order stopping respondent from doing so, she was aware AL had a no-contact order in the then-pending criminal case. Moreover, respondent insisted on this course of conduct despite warnings from both Appledorn and Rawlings that associating with AL could harm the possibility of respondent reuniting with her children. Later, in August 2021, respondent refused to testify against AL in the criminal case related to his assault of her in April 2021, which caused the charges against AL to be dismissed. The trial court reasonably considered this further evidence of respondent's stated intent to do "whatever possible to get [AL] back."

There was also evidence presented that respondent's tumultuous relationship with AL was causing emotional harm to the children. The record established HL and LL were aggressive and violent not only with each other but with other children in the foster home. In fact, HL had substantially injured another child by throwing a chair at the child's head. HL was involved in therapy to address her anger and aggression. LL, who had just turned two years old at the time of the termination hearing, was likewise referred to infant mental health to address concerns about his anger and aggression. EC, like her siblings, was also in therapy.

On the basis of this evidence, the trial court concluded respondent had exposed and would continue to expose the minor children to harm. More specifically, the trial court found that respondent's repeated decision to force the children to live in an environment where domestic violence was prevalent was causing emotional harm to the children, and that her insistence on maintaining a relationship with a known-domestic abuser would likely cause the children harm in the future if returned to her care. The trial court reasoned that respondent's decision to pursue a relationship with AL despite the caseworkers' warnings that it could jeopardize her reunification with her children was evidence that respondent would continue to choose her relationship with AL over the well-being of the children. The trial court further reasoned that there was not a reasonable likelihood that respondent would improve and realize her errors in judgment considering that there had been no such improvement after respondent completed classes focused on the issue. Considering the evidence on the record, and giving deference to the trial court's superior position to judge the credibility of the witnesses that appear before it, we conclude that none of these

findings were clearly erroneous. *In re Sanborn*, 337 Mich App at 272. We further conclude that the trial court's reasoning did not run afoul of *In re Jackisch*, 340 Mich App at 334-335, because the trial court clearly did not rely on the fact that respondent was a victim of domestic violence as a basis for terminating her parental rights. Rather, the trial court properly focused on respondent's own conduct and behavior, and how that conduct and behavior caused harm or would cause harm to the children.

Turning to the specific statutory grounds cited by the trial court, its findings plainly supported termination under MCL 712A.19b(3)(j). That subsection provides that a trial court may terminate parental rights if it finds by clear and convincing evidence that "[t]here [was] a reasonable likelihood, based on the conduct or capacity of the child[ren]'s parent, that the child[ren] will be harmed if [they are] returned to the home of the parent." MCL 712A.19b(3)(j). "[A] parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child[ren] will be harmed if returned to the parent's home." *In re White*, 303 Mich App 701, 711; 846 NW2d 61 (2014). For the reasons detailed above, respondent's decision to continue to expose the children to domestic violence was likely to cause them harm if they were returned to her care. See *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011) (explaining that MCL 712A.19b(3)(j) contemplates both physical and emotional harm). The children already showed signs that they were suffering harm from the exposure, and respondent's actions and statements revealed that she either did not understand these issues or did not care about them. Respondent planned to get back together with AL at any cost, including not only risking the safety and health of her children, but risking her continued involvement in the children's lives. In light of this conduct, it was reasonable to believe the children would be harmed if returned to respondent's home. Accordingly, on this record, the trial court did not clearly err when it found that there was clear and convincing evidence to terminate respondent's parental rights under MCL 712A.19b(3)(j). *In re Sanborn*, 337 Mich App at 272. Because we conclude that the trial court properly found that petitioner established one statutory ground for termination, we decline to address the other grounds found by the trial court. See *In re Brown/Kindle/Muhammad Minors*, 305 Mich App at 635.

## III. BEST INTERESTS

Respondent next argues that the trial court clearly erred when it found that termination of respondent's parental rights was in the children's best interests. We disagree.

## A. STANDARD OF REVIEW

This Court reviews for clear error a trial court's decision that termination is in a child's best interests. *In re Jackisch*, 340 Mich App at 333. "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Id.*

## B. ANALYSIS

"Once a statutory basis for termination has been shown by clear and convincing evidence, the court must determine whether termination is in the child's best interests." *In re LaFrance*, 306 Mich App 713, 732-733; 858 NW2d 143 (2014), citing MCL 712A.19b(5). " 'The focus at the

best-interest stage has always been on the child, not the parent.' " *In re Payne/Pumphrey/Fortson Minors*, 311 Mich App 49, 63; 874 NW2d 205 (2015) (alterations omitted), quoting *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013). Whether termination is in the children's best interest must be established by a preponderance of the evidence. *In re LaFrance*, 306 Mich App at 733. In considering the issue of whether termination is in the best interest of the minor child, the trial court is permitted to consider

> the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, . . . the advantages of a foster home over the parent's home . . . the length of time the child was in care, the likelihood that the child could be returned to her parents' home within the foreseeable future, if at all, and compliance with the case service plan. [*In re Payne/Pumphrey/Fortson Minors*, 311 Mich App at 63-64 (quotation marks and citation omitted).]

When analyzing this issue, the trial court recognized that limited evidence was presented regarding the bond between respondent and the minor children, but nevertheless found that a bond did exist. The trial court then discussed respondent's parenting ability, which it found was lacking based on respondent's conduct during parenting-time visits. Pertinently, respondent was inattentive during parenting time, ignored instructions from her foster-care workers, and often allowed EC to manage the two younger children. Respondent also frequently chose to focus on her cellphone instead of the children despite having limited time with them each week. Even after completing parenting classes, respondent's parenting ability did not improve over the long term, although she sometimes demonstrated short-term improvement. The trial court found that, taken together, this evidence showed that respondent either would not or could not improve her parenting ability. This finding was not clearly erroneous, and supported that termination was in the children's best interests.

Next, the trial court addressed the children's need for stability, permanence, and finality. Appledorn testified that each of the children needed such, noting that EC specifically expressed anger with respondent for failing to improve her situation. EC was in therapy to deal with these mental-health concerns. HL and LL were younger, but still expressed their need for permanence and stability. Relevantly, they had become abnormally aggressive and violent with each other as well as other children. HL caused one child to suffer a serious injury by throwing a chair. HL was in therapy to deal with the problems, while LL was being referred to infant mental health due to similar concerns. This in turn demonstrated the children's need for such permanence and stability, which respondent could not provide, despite a significant amount of time and services. After 15 months, respondent still did not have a proper home or parenting abilities, and repeatedly chose to continue seeing AL instead of focusing on establishing a healthy and safe environment for her children. There was no suggestion that respondent would suddenly realize the error of her ways and remedy the issues when she had yet to even demonstrate that she understood the need to do so. Consequently, the trial court properly concluded that this factor weighed in favor of termination.

There also was evidence establishing that the children's current homes were better suited to serve the children's needs. EC lived with her biological father, who was supportive of her mental health and participation in therapy. LL and HL lived with foster parents, with whom they

were bonded and from whom they received satisfactory support. Thus, this factor also weighed in favor of termination of respondent's parental rights.

The next factor addressed by the trial court was how long the children had been in care and the likelihood they would be returned to respondent. At the time of termination, the children had been out of respondent's home for 15 months. Given respondent's failure to improve any of the issues related to the reasons for the trial court removing the children from the home, especially with respect to exposure to domestic violence, there was no support in the record that the children would be able to return to respondent's care in a reasonable time. Accordingly, it was not clearly erroneous for the trial court to determine that this factor weighed in favor of termination.

The trial court also considered respondent's compliance with her parent-agency agreement (PAA). While the record showed that respondent regularly complied with the PAA and completed the relevant courses, she failed to show any benefit from them. Consequently, despite her appearance of complying with the PAA, the trial court properly relied on the troubling lack of improvement exhibited by respondent. In correlation with this, the trial court noted that respondent exposing the children to harm in the form of domestic violence was an important factor when considering the best interests of the minor children. *In re White*, 303 Mich App at 714. The trial court's conclusion that respondent would continue to expose the children to harm by continuing her relationship with AL despite his repeated commissions of domestic violence was not clearly erroneous. The record showed that respondent wanted to be in a relationship with AL at any cost, and did not change her mind when she was informed that continuing a relationship with AL could cause her to have her parental rights terminated. Respondent followed through on her expressed intent by meeting with AL in July 2021, and refusing to testify against him in August 2021. Therefore, the trial court did not clearly err when finding that this factor weighed in favor of termination being in the minor children's best interests. *Id*.

In sum, although respondent undoubtedly loved her children and had at least a slight bond with them, all of the remaining factors considered by the trial court weighed in favor of termination being in the children's best interests. When comparing the love and minimal bond with respondent to the remaining factors, the trial court did not clearly err when it concluded by a preponderance of the evidence that termination of respondent's parental rights was in the best interests of the minor children.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Mark J. Cavanagh
/s/ Jane E. Markey

-9-