*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* JEWELL, Minors.

UNPUBLISHED
January 11, 2024

No. 365379
Bay Circuit Court
Family Division
LC No. 22-013322-NA

Before: HOOD, P.J., and JANSEN and FEENEY, JJ.

PER CURIAM.

Respondent-father appeals as of right an order terminating his parental rights to three children, WJ1, WJ2, and WJ3, under MCL 712A.19b(3)(b)(*i*) (parent's act caused physical injury or abuse). The termination took place by way of the initial dispositional order as a result of aggravated circumstances (severe physical abuse against WJ3). Petitioner, the Department of Health and Human Services (DHHS), also sought to terminate the parental rights of the children's mother, TJ, but the court declined to do so and concluded that respondent had been the perpetrator of the abuse. On appeal, respondent contends that the trial court erred by finding a statutory ground for termination and by finding that it was in the children's best interests to terminate his parental rights. We affirm.

To terminate parental rights, the trial court must initially find, by clear and convincing evidence, at least one statutory ground for termination, MCL 712A.19b(3).This Court reviews for clear error the trial court's factual findings and its ultimate determination that a statutory ground has been established, *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). A finding is clearly erroneous if, even if some evidence supports it, the reviewing court is nevertheless left with the firm and definite conviction that the lower court made a mistake. *Id*.

This Court also reviews for clear error a lower court's decision that termination is in a child's best interests. *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012).

MCL 712A.19b(3) states, in pertinent part:

> The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

* * *

(b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:

(*i*) The parent's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home.

As an initial matter, the petition alleged that WJ3, who was only two months old at the time, suffered severe physical injuries. Respondent states the following in his appellate brief: "Appellant does not dispute that [WJ3] suffered physical injuries. There was testimony that she suffered an ear hematoma, a femur fracture, numerous rib fractures and intracranial bleeding. There was also testimony that these injuries were consistent with child abuse." WJ3 qualified for "Early On" services because of neurological problems and had some delays in speech and motor skills. Testimony established that the delays could have been related to the "abusive head trauma or the brain bleeds." A child-protective services (CPS) worker said that WJ3's injuries were very severe and of a nonaccidental nature and that "[t]he parents were the only caretakers of [WJ3] during the times these incidents would have happened."

Clearly, adequate evidence of severe physical injuries and physical abuse existed as defined in MCL 712A.19b(3)(b). Respondent argues that petitioner failed to present sufficient evidence that it was he, and not TJ, who inflicted the injuries and abuse and that petitioner failed to prove that all the children would suffer harm in the future if returned to him. He also contends that it was not in the children's best interests to terminate his parental rights. The petitioner-appellee and children's lawyer-guardian ad litem correctly state, however, that this Court's decision in *In re Ellis*, 294 Mich App 30, 33-36; 817 NW2d 111 (2022) resolved this issue and held as follows:

The most significant and interesting argument respondents raise is that it is impossible to determine which of them committed this heinous abuse of the minor child. That would be an extremely relevant, and possibly dispositive, concern in a criminal proceeding against either or both of them, but it is irrelevant in a termination proceeding. When there is severe injury to an infant, it does not matter whether respondents committed the abuse at all, because under these circumstances there was clear and convincing evidence that they did not provide proper care.

* * *

[B]ecause the respondents were the sole caregivers of a nonaccidentally injured child, the trial court had 'little choice but to conclude that one or both parents abused [the child] and that the other parent failed to protect him.'

* * *

We hold that termination of parental rights under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (j) and (k)(*iii*) is permissible even in the absence of definitive evidence regarding the identity of the perpetrator when the evidence does show that the respondent or

-2-

respondents must have either caused or failed to prevent the child's injuries. [Citations omitted.]

In *Ellis*, the baby, less than two months old, was brought to the hospital with "swelling and multiple skull fractures on the upper-rear right side of his head. He had internal bleeding inside the skull, over the coating of the brain, in the area of the fractures as well as on the left side of his head. In the area of the fractures, he had reduced blood supply to his brain . . . [and] 13 broken bones, including 7 partially healed fractures to his posterior ribs . . . [and] fractures to bones in an arm and in his legs." *Ellis*, 294 Mich App 31-32. None of the injuries were accidental or related to genetic problems or a difficult child birth. *Id.* The trial court terminated both parents' parental rights after finding that the parents were the only two individuals who cared for the child, and the explanations they provided were "inconsistent with the extent and nature of the child's injuries" that were numerous and indicative of child abuse. *Id.* at 35. This Court affirmed the determination that one parent perpetrated the abuse and one of them failed to prevent it; "consequently, it did not matter which did which." *Id.* Due to the ages of the injuries and the parents' inability to prevent the ongoing abuse, it was also likely that the child would be injured again if returned to the care of either. *Id.* at 24.

"If a trial court finds that a statutory basis for terminating parental rights exists by clear and convincing evidence, it is required to terminate parental rights if it finds from a preponderance of evidence on the whole record that termination is in the children's best interests." *In re Brown/Kindle/Muhammad*, 305 Mich App 623, 637; 853 NW2d 459 (2014) (quotation marks and citation omitted); see also MCL 712A.19b(5).

> The trial court should weigh all the evidence available to determine the children's best interests. To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*In re White*, 303 Mich App 701, 713-714; 846 NW2d 61 (2014) (quotation marks and citations omitted).]

Here, *Ellis* controls and provides the basis for the trial court's determination that respondent abused WJ3. Considering the evidence by comparing the two parents' performance on their parent-agency agreements, the trial court had more than sufficient evidence to find by clear and convincing evidence that respondent, not TJ, inflicted significant injuries on WJ3 and abused her, and that the children would be harmed in the future if placed with respondent. And the evidence was more than sufficient for the trial court to find by a preponderance of the evidence that termination was in the children's best interests.

A worker with Family Supportive Services (FSS) stated that respondent, during the course of having visitations with the children, had gotten worse in terms of "managing more than one child" and "remaining calm and dealing with situations that arose." As time progressed, he would "raise his voice" or "grab a child" in a "jerky manner" as a first reaction and was "starting to get

more angry." The worker stated that respondent "struggled with staying calm" and admitted to being overwhelmed parenting three children and wanting the visits to end earlier. She said that respondent "raised his voice very frequently" and would sometimes use a swear word, even over something minor like a spilled drink. He also had trouble keeping track of the children. At one visitation, he left WJ3 crying and just walked away, "sighed," and "shook his head." He "expressed that crying just overwhelms his senses and makes him instantly angry."

Further, there were multiple times he had gone into the restroom for a "break" when one of the children cried. Respondent admitted to the FSS worker that he was "getting really mad" when WJ1 wanted the worker, and not respondent, to change his pullup. Respondent had "yelled at [WJ1] extremely loud[ly]." And at one point, respondent restrained WJ2 and raised his voice to try to get WJ2 to stop crying. Respondent had admitted to the FSS worker that it had been "too hard" for him to care for his small children. She opined that it was not safe to have respondent parent all three children. She said that he had trouble keeping the children safe from hazards like moving cars. Also, respondent believed that these very young children (ages 5, 2 and 1) needed to "earn their snacks."

The FSS worker said that respondent was argumentative about parenting education and told her that "he believed he should be able to parent from anger and aggression because it works." He was not responsive to suggestions about handling things in a non-aggressive manner. She said that multiple incidents took place during which respondent got physical with the children by grabbing or pushing them. When she suggested that he discuss how to stay calm with a counselor, he said that he did not want to do so.

The FSS worker testified that respondent took no responsibility for WJ3's injuries: "And he told me that the incident would not have happened if [TJ] hadn't left him alone with the children. And he said it was [TJ's] fault 'cause [TJ] shouldn't have him alone [sic]." The worker said that the children were "hyper" and "all over with place" during visits with respondent but calm and "completely different children" with TJ. And in fact, WJ1 spoke of TJ as his "favorite person." The FSS worker said that WJ1 would "initiate hugs and I love yous with" TJ but not with respondent. And when respondent would raise his voice, WJ1 would "head over to [the worker] and just lean against [her] legs and look at [respondent]." The FSS worker said that WJ3 would always smile for TJ during visits and only smiled once for respondent. She opined that TJ could manage all three children and was "very much on top of their needs," in a "night and day difference" from how respondent handled them; she had never seen TJ lose her temper with them. The worker said that she would feel comfortable leaving TJ alone with the children. She averred that TJ had come to the realization that her relationship with respondent had been abusive and controlling. TJ told the worker that it was respondent who had hurt WJ3.

Respondent's counselor testified that TJ and respondent did not make any progress "in the short time that" they worked together. He said that respondent had a tendency to view himself as a victim or feel like he was being judged or misunderstood.

An employee with Early On had been working with WJ3 to get her to achieve developmental milestones. This employee believed that TJ could manage all three children at once, but she added that respondent came to only one session and "fell asleep during the session."

Respondent's own grandmother opined that TJ "is a very attentive mother" and "a great mom" who "protects her children and loves her children." She said that TJ "was very, very protective and loving of her children" and that the children "were always really close with their mom." Even someone described as respondent's "dear friend" said that he would trust TJ to watch his children and would trust TJ and respondent to watch his children but would not trust respondent alone.

Respondent admitted that he did not have an established residence and was "couch surfing with friends or living out of [his] truck most of the time." He admitted that he had been charged with domestic violence in Mississippi.

TJ's mother, RN, said that, shortly after WJ3's brain injuries, respondent said to her, "I had an accident with WJ3" but did not provide details, and RN advised him to tell TJ and CPS the details of what had happened. He then told TJ that he had dropped WJ3. TJ told RN that she felt that respondent was keeping something from her and said that she was going "push him because I need to know the truth." When TJ asked for more information, respondent said that he "tripped over a baby gate with the dog" and fell onto WJ3. WJ3's doctors determined that her injuries were inconsistent with respondent's explanation for her significant injuries.

RN said that, during a parenting time when she was the supervisor, WJ1 said, " 'Daddy hit me in the head,' " at which point respondent said, " 'Buddy, we talked about that. Remember that never happened, it was just an accident.' " WJ1 then said, " 'That's right daddy, I'm sorry. It was my fault.' " RN additionally claimed that respondent's parenting ability seemed to deteriorate as visitations progressed. Also, respondent had expressed to her that the incident with WJ3 would not have happened if TJ had not left him with the children.

RN spoke about the children's close bond with TJ. She said that respondent and WJ3 seemed to have no bond at all and that WJ1 had a lot of anger toward respondent.[1] RN testified:

> And, he [WJ1] said I'm not calling him daddy anymore, I call him Will because I'm mad at him. And, I said he still is your dad and he said well he beat me in the head until I puked and then when my mommy came home she saved me. And, I said how did your mommy save you? And, he said she let me come out of my room.

RN said that respondent was inconsistent with virtual visitations and that the children did not ask to telephone respondent. She did not think that WJ3 or WJ2 would be impacted by a termination of respondent's parental rights. She said that the situation with WJ1 was more complex but that WJ1 had a lot of anger toward respondent.

A DHHS worker testified that "the physical safety concerns aren't outweighed by the bond considerations with respect to [respondent] and any of the children." She said that the children

---

[1] She said that respondent admitted to having no bond with WJ3.

needed to be physically safe and that termination of respondent's parental rights was in their best interests. She emphasized that "[WJ3] almost died."

TJ spoke about realizing, through counseling, that her relationship with respondent had been abusive. TJ said that respondent always blamed others for problems. She said that WJ3 had been "intentionally abused." She averred that she had never hurt her children in the past and never intended to in the future. She said that at first, she did not believe that abuse had occurred but then, after seeing the University of Michigan reports "saying this is abuse" and recognizing that respondent's "lies are not matching what [the experts were] saying," she realized that respondent had intentionally abused WJ3.

TJ's counselor believed that respondent had inflicted mental and emotional abuse on TJ in the form of verbal abuse and "controlling behaviors." The counselor stated that TJ had come to realize that respondent's patterns of behavior and narcissistic abuse posed a risk to the children. TJ was now persistent about wanting her relationship with respondent to end. The counselor was confident that TJ was capable of both protecting her children and avoiding getting into another abusive relationship. She was asked whether TJ could have caused the injuries to WJ3, and she replied, "Based on my assessment of her as a person and her personality and what I know of her, I do not believe she could injure her child." The counselor added, "[A]t no point did I ever have any belief or hint that [TJ] abused her child."

Even despite this Court's conclusions in *In re Ellis*, the petitioner presented sufficient clear and convincing evidence at the termination hearing to establish that it was respondent, and not TJ, who abused WJ3. Indeed, respondent himself expressed that the head-injury incident[2] would not have occurred if TJ had not left him alone with the children. And it was respondent, not TJ, who handled the children aggressively and was quick to anger.

This evidence was also more than adequate to prove by a preponderance of the evidence that it was in the children's best interests to terminate respondent's parental rights and that the children would suffer harm if placed with respondent. Respondent had no home. His parenting skills had deteriorated. His bonds with the children were nonexistent to weak or problematic. Most importantly, he inflicted extremely serious and life-threatening injuries against WJ3 and had made no progress toward resolving the anger and aggression issues that had led to those injuries. All three children would be at risk if placed with respondent. Termination of respondent's parental rights regarding all three children at the initial adjudication/disposition was supported by legally admissible clear and convincing evidence and was clearly in the children's best interests.

Affirmed.

/s/ Noah P. Hood
/s/ Kathleen Jansen
/s/ Kathleen A. Feeney

---

[2] The ear injury occurred at a different time.