*In re* BROWN/KINDLE/MUHAMMAD MINORS

Docket No. 318357. Submitted June 4, 2014, at Detroit. Decided June 12, 2014, at 9:05 a.m.

The Department of Human Services petitioned the Wayne Circuit Court, Family Division, to terminate the parental rights of respondent to her three minor children pursuant to MCL 712A.19b(3)(b)(*ii*), (b)(*iii*), (g), and (j), after the children told Child Protective Services workers that respondent had repeatedly sent them to stay with a man who sexually abused them. Petitioner moved to admit these statements and subsequent videotaped statements made to forensic interviewers under MCR 3.972(C)(2), which allows a statement made by a child under 10 regarding sexual abuse to be admitted into evidence through the testimony of a person who heard the child make the statement if it has been made under circumstances that provide adequate indicia of trustworthiness. At a pretrial hearing to determine whether the statements met this requirement, respondent objected to the forensic interviewers' testimony about the children's statements, arguing that the videorecording of the interview was the best evidence of the statements' contents. The court, Christopher D. Dingell, J., overruled the objection and declined to admit or view the videorecording. After a trial, the court found clear and convincing evidence to terminate respondent's parental rights, and respondent appealed.

The Court of Appeals *held*:

1. The trial court clearly erred by not admitting the videorecorded forensic interviews of the children pursuant to MCL 712A.17b(5), which requires such statements to be admitted at all nonadjudicative proceedings instead of live testimony. The hearing to determine whether the children's statements were admissible under MCR 3.972(C)(2) was a nonadjudicative proceeding, and the videorecordings were the best evidence of the children's statements. However, reversal was not warranted because the alleged inconsistencies between the witnesses' videorecorded statements and their testimony were explored on cross-examination and acknowledged by the trial court.

2. The trial court did not clearly err by terminating respondent's parental rights. The fact that the children were bonded with

respondent and had been placed with relatives did not outweigh the fact that respondent lacked the ability to keep the children safe and effectively parent them.

Affirmed.

PARENT AND CHILD — CHILD PROTECTIVE PROCEEDINGS — EVIDENCE — VIDEORE-CORDED STATEMENTS.

A pretrial hearing to determine whether a child's statements to another person are admissible through that person's testimony under MCR 3.972(C)(2) is nonadjudicative for purposes of MCL 712A.17b, which requires any videorecorded statement the child made under that provision to be admitted at all proceedings except at the adjudication stage.

*Bill Schuette*, Attorney General, *Aaron D. Lindstrom*, Solicitor General, *Matthew Schneider*, Chief Legal Counsel, and *Lesley Carr Farrow*, Assistant Attorney General, for petitioner.

Michigan Children's Law Center (by *Lindsay Her-mans*) for the minors.

*Nancy A. Plasterer* for respondent.

Before: WILDER, P.J., and SAAD and K. F. KELLY, JJ.

PER CURIAM. Respondent appeals as of right the order terminating her parental rights to her minor children—MB, AM, and AK—pursuant to MCL 712A.19b(3)(b)(*ii*) (failure to prevent abuse), (b)(*iii*) (nonparent caused abuse and reasonable likelihood of repeated abuse by nonparent if placed in parent's home), (g) (failure to provide proper care or custody), and (j) (reasonable likelihood that the minor child would be harmed if returned to the parent's home).[1] Although the trial court clearly erred by not admitting the videorecorded forensic inter-

---

[1] The order also terminated the parental rights of the unknown father of AM. The parental rights of MB's and AK's respective fathers were not terminated.

views of the children, under the circumstances of this case, the error does not require reversal. Accordingly, we affirm.

## I. BASIC FACTS

The Department of Human Services filed a petition alleging that respondent failed to protect the minor children from sexual abuse by repeatedly sending them to stay at the apartment of James Lester, whom the children called "Uncle Lenny," even after the children told respondent that they were being abused. The petition sought termination at original disposition.

Under MCR 3.972(C), the "tender years" exception to the rule against admitting hearsay, petitioner moved to admit into evidence statements that each of the three children made to Child Protective Services (CPS) workers and to Sandra Brown, MB's paternal grandmother. Petitioner also sought to admit statements the children made to forensic interviewers from the Kids-TALK Children's Advocacy Center.[2] The trial court conducted a two-day hearing to determine whether the statements were admissible under MCR 3.972(C)(2)(a) and received the testimony of a number of witnesses.

Jenette Lippiello, a Kids-TALK forensic interviewer, was qualified as an expert in forensic interviewing. AM told Lippiello that she was taken from her mother's care because Lester touched her "coo-coo," indicating her genital area, when she was spending the night at his home with her brothers. AM said she had been sleeping

---

[2] Kids-TALK is a community-based program that provides treatment to "suspected child victims of sexual abuse, physical abuse, neglect, or other forms of psychological trauma," and also conducts forensic interviewing of child victims. The Guidance Center, *Kids-TALK Children's Advocacy Center* <http://www.guidance-center.org/kids-talk> [http://perma.cc/3DR6-XTV5] (accessed June 12, 2014).

at the time, but knew something had happened because "she remembered it, and because . . . it felt like something crawling on her." AM also told Lippiello that she knew it had happened because respondent told her. AM told Lippiello that respondent found out about the touching because her mother's friend saw it on the news. Respondent did not make AM visit Lester after that. AM did not report seeing any abuse directed at either of her brothers.

Lippiello also interviewed MB. MB told Lippiello that every time he and his brother would go to Lester's, Lester would "bother" their "privates." Lippiello asked MB what he meant by the word "bother," and MB answered that Lester "would put his mouth on [MB's] private, and [put] his mouth on [AK's] private." MB stated that the abuse started when he was seven years old. When Lippiello asked MB to tell her about the last time Lester abused him and AK, MB said that they were spending the night at Lester's when Lester put his mouth on MB's private and sucked it. MB then saw Lester go over to AK, place his private in AK's mouth, and make AK suck it. MB indicated that he told his mother after the first instance of abuse and she told him they would not have to go back. However, they did go back after Lester asked respondent if he could see the boys. MB said respondent "made them" return to Lester's apartment.

On the second day of the hearing, respondent objected to the forensic interviewers' testimony regarding the content of children's statements, arguing that "the Court actually seeing [the videorecorded Kids-TALK interview] would be . . . the best evidence rather than having someone interpret them." The fathers and Lester joined in the request. Petitioner offered to produce the videorecorded interview under seal, to be

reviewed only by the trial court,[3] and further requested that it be kept secured. The trial court overruled the objection and declined to admit or view the actual interview, but left open the opportunity to revisit the issue at trial.

Loren Shiener, whom the court recognized as an expert in forensic interviewing, testified that she interviewed AK at Kids-TALK. Although AK had a hard time focusing on the interview, he told Shiener that Lester touched his "private part" inside his pants. AK said that the touching occurred while he was sleeping and that he tried to pull his pajama bottoms up when he woke. MB, seeing this occur, said to Lester, "Get off my brother like that." AK said he told his mother about the incident, but he could not remember how respondent reacted to his disclosure.

Brown, MB's paternal grandmother, testified that in January 2013, she was driving MB to her house when MB told her, "Uncle Lenny has been touching us." Brown stopped the car and asked MB to repeat what he said. MB told her that Lester touched his privates and put MB's private in Lester's mouth and also put Lester's private in AK's mouth. MB told Brown it happened every time they went to Lester's apartment. MB told his mother about the abuse and she reassured him that they would never have to go back there again. Later, however, Lester asked respondent if the boys could come over and respondent allowed Lester to pick them up. MB reported that the abuse continued.

Brown opined that MB was telling the truth. Although she had caught him telling lies before, she stated that when he was lying he could not look her in the face and would stutter. But when he disclosed the abuse to her, MB

[3] The videorecorded interviews had previously been made available for viewing by all counsel of record. MCL 712A.17b(7).

looked at her face and was very consistent. The next day Brown told respondent that she needed to discuss respondent's "sons being molested." According to Brown, respondent said, "What? You called Child Protective Services on me?" and hung up.

Tricia Shano, the CPS worker who authored the petition in this case, testified that she interviewed MB at his school on January 29, 2013. As Shano introduced herself and began the interview, MB stated that he knew she was there to talk about what Lester did to him. MB told her that, during a visit to Lester's apartment the weekend before the interview, MB and AK were sleeping on the floor. At one point during the night, Lester put his mouth on MB's privates. MB then watched as Lester went over to AK and placed his private in AK's mouth. MB told Lester to stop, but Lester hit him with an extension cord. MB told Shano he did not tell respondent about the abuse because he was afraid, but Shano could not recall the reason he gave for being afraid.

Shano interviewed MB at his school again, on February 11, 2013, after the children made statements indicating that respondent may have been aware of the abuse. MB told her that the first time they went to Lester's apartment, Lester "bothered" AK's privates. MB also said that he told his mother about the abuse and she said, "Okay, you won't have to go back anymore."

Shano also interviewed AM on February 11, 2013. AM said that Lester touched her "middle," indicating her vaginal area. AM told respondent what had happened, and respondent did not make AM go back to Lester's, but she continued to let her brothers go. Shano concluded that AM, who was five years old at the time of the interview, was telling the truth.

The trial court found that the children's statements "have adequate indicia of trustworthiness," but qualified its finding by noting that "[p]erhaps there is not quite as much trust for the later statements by [MB], also the statements by [AM] and [AK]." The court stated that it had "a great deal of faith that [MB] was telling [Brown] the truth," and that the "fact that [AM] was not sent back over [to Lester's apartment] leaps out."

The matter then proceeded to trial, at which the court received additional testimony from witnesses regarding respondent's ability to parent and protect the children. The court asserted jurisdiction over the children and further found clear and convincing evidence to terminate respondent's parental rights, primarily because of her failure to protect the children from sexual abuse. Respondent now appeals as of right.

## II. TENDER-YEARS HEARING

Respondent first argues that the trial court abused its discretion when it admitted the minor children's out-of-court statements made to the forensic interviewers but denied respondent's request to review the actual videorecorded interviews in camera. We agree that the trial court's refusal to admit the videotapes was contrary to the clear language of MCL 712A.17b(5). However, the trial court's error does not warrant reversal in this case.

"A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010) (citations omitted). "However, decisions regarding the admission of evidence frequently involve pre-

liminary questions of law," which are reviewed de novo. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). Whether the trial court was required to admit the videotapes is a question of statutory interpretation, which we also review de novo. *People v Harris*, 495 Mich 120, 126; 845 NW2d 477 (2014).

In admitting the children's statements to the forensic interviewers into evidence, the trial court relied exclusively on MCR 3.972(C). This court rule permits a trial court to receive as substantive evidence of abuse what would otherwise be deemed inadmissible hearsay evidence. MCR 3.972(C) provides, in part:

> (2) Any statement made by a child under 10 years of age . . . regarding an act of child abuse, child neglect, sexual abuse, or sexual exploitation, as defined in MCL 722.622(f), (j), (w), or (x), performed with or on the child by another person may be admitted into evidence through the testimony of a person who heard the child make the statement as provided in this subrule.
>
> (a) A statement describing such conduct may be admitted regardless of whether the child is available to testify or not, and is substantive evidence of the act or omission if the court has found, in a hearing held before trial, that the circumstances surrounding the giving of the statement provide adequate indicia of trustworthiness. This statement may be received by the court in lieu of or in addition to the child's testimony. [MCR 3.972(C)(2)(a).]

On appeal, respondent does not contest a trial court's ability to receive testimony regarding a young child's statement under this court rule, but argues that the trial court erred by failing to admit and view the actual videorecordings of the children's Kids-TALK forensic interviews.[4] We agree.

_____

[4] Specifically, respondent argues that the children's statements lacked "adequate indicia of trustworthiness," a defect that would have been

MCR 3.972(C)(2) is a general rule that applies to "any statement" made by a child "regarding an act of child abuse, child neglect, sexual abuse, or sexual exploitation, as defined in MCL 722.622(f), (j), (w), or (x)." The trial court correctly referred to this general rule and applied it to MB's statements to his grandmother, which were made spontaneously and were not the result of a forensic interview. The trial court also properly applied the court rule to the unrecorded statements the children made to workers who interviewed them at school.

However, there is a specific statute governing the admissibility of a particular type of statement given by a child: those that have been videorecorded in the manner set forth in detail in MCL 712A.17b, which provides, in relevant part:

> (5) A custodian of the videorecorded statement may take a witness's videorecorded statement. The videorecorded statement shall be admitted at all proceedings except the adjudication stage instead of the live testimony of the witness. The videorecorded statement shall state the date and time that the statement was taken; shall identify the persons present in the room and state whether they were present for the entire videorecording or only a portion of the videorecording; and shall show a time clock that is running during the taking of the statement.

> (6) In a videorecorded statement, the questioning of the witness should be full and complete; shall be in accordance with the forensic interview protocol implemented as required by section 8 of the child protection law, 1975 PA 238, MCL 722.628; and, if appropriate for the witness's developmental level, shall include, but need not be limited to, all of the following areas:

> (a) The time and date of the alleged offense or offenses.

---

cured had the court "viewed the video recordings [to] determin[e] whether and what statements were admissible."

(b) The location and area of the alleged offense or offenses.

(c) The relationship, if any, between the witness and the respondent.

(d) The details of the offense or offenses.

(e) The names of other persons known to the witness who may have personal knowledge of the offense or offenses.

There is no issue in this case that the videorecorded statement complied with the requirements of the statute. And MCL 712A.17b(5) unambiguously provides that, in proceedings brought under MCL 712A.2(b), "The videorecorded statement *shall* be admitted at all proceedings except the adjudication stage instead of the live testimony of the witness." (Emphasis added.) Thus, while the trial court correctly invoked the court rule in general, it inexplicably ignored the statutory mandate that the children's videorecorded statements be admitted into evidence.

We hold that MCL 712A.17b(5) requires a trial court to admit videorecordings of a child's forensic interview during a nonadjudicatory stage—here, a tender-years hearing.

> As always, the goal of statutory interpretation is to ascertain and give effect to the intent of the Legislature. The touchstone of legislative intent is the statute's language. If the statute's language is clear and unambiguous, we assume that the Legislature intended its plain meaning and we enforce the statute as written. [*Harris*, 495 Mich at 126-127 (citations and quotation marks omitted).]

The language contained in MCL 712A.17b(5) could not be more clear: "The videorecorded statement *shall* be admitted at all proceedings except the adjudication stage instead of the live testimony of the witness."

Our Court addressed this statute in *In re Archer*, 277 Mich App 71; 744 NW2d 1 (2007). In *Archer*, the respondent parents argued that the trial court violated MCL 712A.17b(5) when it allowed videorecordings of the minor children's statements to be played during a tender-years evidentiary hearing. *Archer*, 277 Mich App at 81. This Court concluded that the hearing was held "before the adjudicative stage had begun" and, therefore, the trial court did not violate MCL 712A.17b(5) when it admitted videorecordings of the minor children's statements at that time. *Id.* The plain language of the statute, coupled with *Archer*'s holding that a tender-years evidentiary hearing is not adjudicative, compels the conclusion that the trial court in this case clearly erred by failing to admit the videorecordings. The videorecordings were the best evidence of the children's statements, not the forensic interviewers' interpretation of those statements.

Nevertheless, we do not conclude that reversal is necessary. In considering whether to admit the children's statements, the trial court had to first ascertain that the circumstances surrounding the giving of the statements provided adequate indicia of trustworthiness, which included evidence separate and apart from the actual videorecordings. "Circumstances indicating the reliability of a hearsay statement may include spontaneity, consistent repetition, the mental state of the declarant, use of terminology unexpected of a child of a similar age, and lack of motive to fabricate." *Archer*, 277 Mich App at 82.

The trial court acknowledged this list of suggested circumstances on the record, and found that the minor children's statements had adequate indicia of trustworthiness. The trial court noted that MB had "[n]o motive to fabricate," that his statements to his grandmother were

"very spontaneous" and "generally consistently repetitive," and that Brown's testimony seemed consistent with the testimony that followed. There was no videorecording of MB's statement to his grandmother, and the trial court's finding that MB's statement provided adequate indicia of trustworthiness is supported by the record evidence. As for the other children, the trial court indicated its concern regarding the indicia of trustworthiness of their statements. The trial court nevertheless concluded that the statements were admissible. Again, this conclusion has support in the record. Lippiello testified that she believed AM "was telling me the truth as she knew it and her perception of what happened." Regarding MB, Lippiello testified: "I asked him if he would promise to talk about things that are true and tell the truth, and he said yes." Shiener concluded that, although AK initially told her he would not tell the truth, he "could tell the difference between the truth and a lie," and understood that he was to tell only the truth. Each of the siblings' statements seemed to corroborate MB's original statement to his grandmother.

Respondent argues that, had the trial court watched the videorecordings, which were inconsistent with the witnesses' testimony, the trial court would not have admitted the statements into evidence. We note, however, that these inconsistencies were explored on cross-examination and were fully acknowledged by the trial court when it rendered its decision. Accordingly, although the trial court clearly erred when it refused to admit the videorecordings into evidence, reversal is not warranted.

### III. GROUNDS FOR TERMINATION

Respondent next argues that the trial court clearly erred when it terminated her parental rights. We disagree.

"To terminate parental rights, a trial court must find that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been proved by clear and convincing evidence." *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011). "This Court reviews for clear error the trial court's factual findings and ultimate determinations on the statutory grounds for termination. The trial court's factual findings are clearly erroneous if the evidence supports them, but we are definitely and firmly convinced that it made a mistake." *In re White*, 303 Mich App 701; 846 NW2d 61 (2014) (citations omitted).

The court found that termination of respondent's parental rights was justified under MCL 712A.19b(3)(b)(*ii*), (b)(*iii*), (g), and (j), which provide:

The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

\* \* \*

(b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:

\* \* \*

(*ii*) The parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home.

(*iii*) A nonparent adult's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse by the nonparent adult in the foreseeable future if placed in the parent's home.

\* \* \*

636 MICH APP 623 [June

*(g)* The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

*     *     *

*(j)* There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

AM, MB, and AK each disclosed that they were molested by "Uncle Lenny" in his apartment. MB and AK were abused repeatedly. Respondent testified that MB told her about the abuse in either June or August 2012. She confronted Lester, who denied the allegations. Respondent asked MB to repeat his allegations in front of Lester, which he refused to do. Thereafter, respondent continued to allow MB and AK to stay with Lester at his apartment until January 2013 when the petition was filed. It is striking that respondent only knew Lester for a month before allowing her children to stay with him. He was "a friend of [her] friend." Respondent did not know Lester's full name, his address, or how to contact him.

On cross-examination, respondent acknowledged that she allowed her children to be placed in harm's way, but argued that there was no indication that this would happen again. However, MB and AK were sexually abused repeatedly for at least five months after MB disclosed the molestation to respondent; AM and AK also claimed to have told respondent about Lester's practices. It is clear that respondent was in a position to prevent the abuse and failed to do so and that the children would have been at risk of harm in her care,

justifying termination under subsection 19b(3)(b)(*ii*), (b)(*iii*), and (j).

Moreover, respondent was not in a position to provide her children with proper care or custody. At the time of the hearing, she was living in a shelter. Before that, she had transient housing and rarely had hot water or heat. Respondent also had a rather extensive CPS history beginning in 2005. Three of six complaints were substantiated, including one in 2010 for physical neglect and poor living conditions, one in 2007 when AM tested positive for marijuana at birth, and one in 2006 for unspecified physical neglect. Respondent admitted that she smoked marijuana daily before the termination petition was filed. Considering respondent's history of inadequate housing and reliance on other people to raise the minor children, the trial court did not clearly err when it found that respondent was not in a position to provide the children with proper care or custody under subsection 19b(3)(g).

If a trial court finds that a statutory basis for terminating parental rights exists by clear and convincing evidence, it is required to terminate parental rights if "it finds from a preponderance of evidence on the whole record that termination is in the children's best interests. We review for clear error the trial court's determination regarding the children's best interests." *White*, 303 Mich App at 713. To make a best-interest determination, "the court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012) (citations omitted). The fact that a child is placed with a relative weighs against termination. *Id*. at 42-43.

In this case, the trial court focused on the fact that respondent allowed the children to be sexually abused. It noted that she had money to smoke marijuana daily, but did not have money for adequate food or fit housing. Respondent argues that the children are bonded to her and had been placed with relatives. Although the fact that a child is placed with a relative weighs against termination, and a foster-care worker testified that respondent did not miss any supervised visits and that the minor children were bonded to her, it was clear that respondent lacked the ability to keep her children safe or effectively parent them. Respondent repeatedly sent AK and BM to Lester's apartment, where they were sexually abused. She explained that she did so because the boys "begged" her to send them there, as if the requests of a four-year-old and a seven-year-old outweighed any concern respondent may have had for their safety. Additionally, the children's need for permanency, stability, and finality militated against placing the minor children in respondent's care. Testimony that respondent frequently changed housing, lived illegally in a series of abandoned houses without utilities or appliances, and left the minor children in the care of others demonstrates that she cannot offer permanency, stability, and finality. Accordingly, termination of respondent's parental rights was in the best interests of the minor children.

Affirmed.

WILDER, P.J., and SAAD and K. F. KELLY, JJ., concurred.