*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* PEEVER, Minors.

UNPUBLISHED
November 14, 2024
2:25 PM

No. 370902
Crawford Circuit Court
Family Division
LC No. 22-004689-NA

Before: JANSEN, P.J., and RICK and PATEL, JJ.

PER CURIAM.

Respondent[1] appeals as of right the order terminating his parental rights to his minor children, MAP, ADP, and MJP, under MCL 712A.19b(3)(b)(*i*) (parent caused physical injury or sexual abuse of the child or sibling), (b)(*iii*) (nonparent adult's act caused the physical injury or sexual abuse), and (j) (reasonable likelihood the child will be harmed if returned to the parent). On appeal, respondent challenges only the trial court's best-interests findings. We conclude that a preponderance of the evidence supports the trial court's determination that termination of respondent's parental rights to the children was in their best interests, and we are not left with a definite and firm conviction that the trial court made a mistake. We affirm.

## I. BACKGROUND

Respondent is the legal father of MAP, ADP, and MJP. In March 2022, Children's Protective Services (CPS) investigated allegations that respondent sexually abused his ten-year-old stepdaughter, LH, who is the half-sibling of MAP and ADP. During a forensic interview, LH disclosed that respondent digitally penetrated her vagina. LH disclosed that it happened "a couple of times." Respondent admitted to law enforcement investigators that he looked at LH's vagina

---

[1] MAP and ADP have a different biological mother than MJP. Neither of the mothers were named as a respondent and the mothers are not parties to this appeal. Accordingly, "respondent" refers to respondent-father only.

on one occasion when LH was experiencing feminine problems. Respondent admitted he may have touched LH's vagina on that one occasion, but he denied penetration. Respondent was charged with second-degree criminal sexual conduct (CSC-II), MCL 750.520c.[2]

In May 2022, the Department of Health and Human Services (DHHS) filed a petition to terminate respondent's parental rights to MAP and ADP under MCL 712A.19b(3)(b)(*i*), (b)(*iii*), (j), (k)(*ii*) (criminal sexual conduct involving penetration), and (k)(*ix*) (sexual abuse as defined under MCL 722.622). The petition alleged that MAP and ADP were "at imminent risk of harm while in the care and custody of respondent." The petition further alleged, "[b]ased on the sexual abuse of [LH], a sibling of [MAP] and [ADP], there is reasonable likelihood that [MAP] and [ADP] will be harmed if they remain in [respondent's care]." ADP and MAP were removed from respondent's custody and placed with the DHHS. Subsequently, respondent waived the probable-cause determination, and the petition was authorized. ADP and MAP were released to the non-respondent mother under the supervision of the DHHS, and respondent was granted supervised parenting time.

In February 2023, MJP was born.[3] The DHHS filed an amended petition seeking to terminate respondent's parental rights to ADP, MAP, and MJP based on similar facts as the original petition. MJP was removed from respondent's custody and placed with the DHHS. Subsequently, respondent waived the probable-cause determination, and the petition was authorized. MJP was released to the non-respondent mother under the supervision of the DHHS, and respondent was granted supervised parenting time.

At the adjudication, respondent admitted to certain allegations in the amended petition. Respondent admitted that CPS received a complaint based on LH's allegation that respondent digitally penetrated her vagina. Respondent also admitted the allegations that he told law enforcement investigators that he looked at LH's vagina on one occasion when LH was experiencing feminine problems and may have "rubbed" LH's vagina on that one occasion, but denied digital penetration. Respondent also admitted that he was charged with CSC-II as a result of LH's allegations. The trial court accepted respondent's plea. Based on respondent's plea, the trial court found by clear and convincing evidence that it had jurisdiction over the children under MCL 712A.2(b)(1), (2), and (3).[4]

At the termination hearing, LH testified regarding a December 2021 incident where respondent digitally penetrated her vagina. Brooke Karoub, a DHHS caseworker and CPS investigator, testified that MAP and ADP had a bond with respondent.[5] But Karoub opined that

---

[2] In October 2023, a jury found respondent not guilty of the criminal charge.

[3] MJP is not a sibling of LH.

[4] At the adjudicative phase, a court must determine, by plea or trial, whether one or more of the statutory grounds asserted in the petition have been proven by a preponderance of the evidence. See MCR 3.971; MCR 3.972(E).

[5] Karoub conducts parenting time between respondent and ADP and MAP, and another CPS caseworker, Hillary Harubin, conducts respondent's parenting time with MJP.

the children were at risk of harm because of respondent's lack of control of his temper and his sexual abuse of LH. Karoub testified that the fact that LH was sexually abused "indicates that there's a strong likelihood that it could happen to any of the . . . other children." Karoub explained that "grooming behavior will just increase. It will escalate. It doesn't deescalate." Harubin testified that MJP had a bond with respondent. But Harubin opined that MJP was at risk because respondent admitted to digitally penetrating LH. Both Karoub and Harubin recommended that respondent's parental rights be terminated.

Rachel A. Gillmore, M.A., L.P.C., C.C.S., a licensed professional counselor, was qualified as an expert in assessment and treatment of problematic sexual behaviors. Gillmore met with respondent and conducted multiple assessments "to provide insight into potential risk factors that may impact sexual recidivism[.]" But because respondent was found not guilty and had no prior adult criminal history, Gillmore acknowledged "the results of some assessments are considered invalid and cannot be scored accordingly to provide an estimated risk level." First, Gillmore evaluated respondent's "dynamic risk" using the STABLE-2007 assessment "to identify potential behavioral and emotional risk areas." Gillmore testified that "dynamic risk factors can change over time with intervention [and] treatment." Although "the results of the assessment cannot be scored formally[,]" Gillmore exercised her clinical judgment to utilize the assessment because there was a preponderance of the evidence that "sexual contact had occurred . . . ." Respondent was flagged for two risk factors in the assessment: "negative emotionality" and "poor emotional coping." Based on the informal scoring of the STABLE-2007 assessment, Gillmore determined that respondent's risk for sexual recidivism was "at the upper end of low risk[.]"

Gillmore also conducted a Static 99-R test to assess respondent's risk for sexual recidivism. Gillmore explained that the Static 99-R test was applicable to all phases of the criminal process, and did not require a conviction. Because there was a preponderance of the evidence to substantiate respondent's sexual abuse of LH, Gillmore opined that the Static 99-R test was valid. The Static 99-R test identified two risk factors for respondent: his age at the time of the offense and his "history of previous charges related to [criminal sexual conduct]" when respondent was "fifteen years old." Respondent's overall assessment under the Static 99-R test was "in the moderate range," placing his risk of recidivism "at about [3.5% to 7.5%] chance of sexual recidivism without treatment."[6] Unlike the dynamic factors assessed in the Stable-2007 test, Gillmore explained that the Static 99-R assessment was "pretty black and white" because it was based on "historical factors that cannot change over time" and there was no "wiggle room or space for clinical judgment" with the assessment. However, Gillmore stated that the Static 99-R does not consider a related victim, such as LH,[7] a risk factor. Instead, the scoring criteria are based on primarily unrelated or stranger victims because "[t]hat's usually indicative of more severe deviant sexual behaviors . . ." and thus a "higher risk for sexual recidivism."

---

[6] The Static 99-R's risk assessment is based on a norming population of individuals with problematic sexual behaviors, not the general population.

[7] Gillmore explained that LH is considered a related victim because respondent was a father figure to LH for more than two years.

Based on the two assessment models, Gillmore opined that respondent was a low risk for sexual recidivism. Although the static factors assessed in the Static 99-R test could not be changed, Gillmore testified that the dynamic factors assessed in the Stable-2007 test could be changed with intervention. Based on these assessments, Gillmore recommended that respondent receive treatment to address his lack of coping strategies and inappropriate boundaries. Gillmore opined that, in general, an individual's risk factors identified through the Stable-2007 will likely decrease after one to two years of specialized therapy. However, she testified that regardless of any specific intervention or treatment, no one with "any sort of level of risk" would decrease "to zero or no risk." Notably, Gillmore acknowledged that respondent has problematic sexual behaviors and testified that it would not be appropriate for respondent to babysit children without intervention or treatment. In fact, she recognized that the incident with LH was a grooming behavior. And although Gillmore opined that respondent's actions were not sexually motivated, she testified that touching of genitals (which respondent admitted he did) for non-sexual purposes was grooming behavior. Gillmore clarified, however, "engaging in a behavior that appears to be grooming without having evidence that it's a pattern of behaviors does not constitute grooming."

Respondent testified that, after Gillmore' risk assessment, he reached out to Harubin and obtained a referral to an anger management class and a guiding good choices course. He completed both courses as well as some counseling with Gillmore. Respondent admitted that he was resistant to counseling and treatment until Gillmore conducted the assessment right before the termination trial began, but maintained he was motivated to engage in treatment because it would be beneficial. However, respondent disputed Gillmore's assessment that he needed treatment for problematic sexual behaviors and he testified that he did not have problematic sexual behaviors. Although respondent maintained that, having some hindsight, he would not make the same decision that he did with LH, he explained that he would not make the same decision because he "wouldn't be sitting in this courtroom today."

Respondent's counsel did not contest the facts establishing statutory grounds, and maintained that the only dispute was whether termination of respondent's parental rights was in the best interests of the children. The trial court issued an order and opinion terminating respondent's parental rights as to the children, finding it is in the best interests of the children to terminate respondent's parental rights.[8] This appeal ensued.

## II. ANALYSIS

Respondent contends it was not in the best interests of the children for the trial court to terminate his parental rights. We disagree.

We review a trial court's decision that termination is in a child's best interests for clear error. *In re Atchley*, 341 Mich App 332, 346; 990 NW2d 685 (2022). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In*

---

[8] The trial court credited LH's testimony and, given respondent's counsel's acknowledgment that a statutory basis for termination existed, the court concluded that termination was warranted under MCL 712A.19b(3)(b)(*i*), (b)(*iii*), and (j).

*re Sanborn*, 337 Mich App 252, 276; 976 NW2d 44 (2021) (cleaned up). "To be clearly erroneous, a decision must be more than maybe or probably wrong." *In re Ellis*, 294 Mich App 30, 33; 817 NW2d 111 (2011). "We review the interpretation and application of statutes and court rules de novo." *In re Ferranti*, 504 Mich 1, 21; 934 NW2d 610 (2019). "De novo review means we review this issue independently, with no required deference to the courts below." *Id*.

"If a trial court finds that a statutory basis for terminating parental rights exists by clear and convincing evidence, it is required to terminate parental rights if it finds from a preponderance of evidence on the whole record that termination is in the children's best interests." *In re Brown/Kindle/Muhammad Minors*, 305 Mich App 623, 637; 853 NW2d 459 (2014) (cleaned up); see also MCL 712A.19b(5). The focus of the best-interest determination is on the child, not the parent. *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). Factors to be considered for purposes of the best-interest analysis include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts Minors*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012) (cleaned up). A court may also consider whether it is likely that a child could be returned to a parent's home "within the foreseeable future, if at all." *In re Frey*, 297 Mich App 242, 249; 824 NW2d 569 (2012). Other relevant factors include "a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014). Because a child's placement with a relative militates against termination, see MCL 712A.19a(8)(a), "the fact that a child is living with relatives when the case proceeds to termination is a factor to be considered in determining whether termination is in the child's best interests." *Olive/Metts*, 297 Mich App at 43.

A preponderance of the evidence in the record supports that termination was in each of the children's best interests. The trial court acknowledged that respondent had a bond with each of the children, but found respondent poses a risk to the children based on his conduct. The trial court summarized: "[Respondent] is so lacking in insight, maturity, guidance and judgment, that he is not in a position to parent. These deficits in parenting ability outweigh the bonds that are present." The trial court recognized that the children are placed with the non-respondent mothers, but concluded that termination of respondent's parental rights was in the children's best interests.

Respondent contends that he does not present a "substantial threat" to the children, and the "behavioral risk" he poses does not outweigh their bond with respondent or their need for permanency, stability, and finality. Respondent has cherry-picked portions of Gillmore's testimony to support his argument. Indeed, Gillmore opined that respondent was a low risk for sexual recidivism and recommended that respondent receive treatment to address his lack of coping strategies and inappropriate boundaries. However, Gillmore acknowledged "the results of some assessments are considered invalid and cannot be scored accordingly to provide an estimated risk level." Gillmore also acknowledged that respondent has problematic sexual behaviors and testified that it would not be appropriate for respondent to babysit children without intervention or treatment. She also recognized that the incident with LH was a grooming behavior. Karoub also opined that there is a "significant risk" to the children's safety and well-being if reunified with respondent, explaining: "[S]exual abuse of a child is not something someone should have an opportunity to repeat."

Gillmore opined that, in general, an individual's risk factors identified through the Stable-2007 will likely decrease after one to two years of specialized therapy. But Gilmore also testified that no amount of intervention or treatment for problematic sexual behavior would decrease an individual's risk of recidivism to zero. Regardless, the one to two year time period was simply a general estimate. There was no testimony that respondent would require less than one to two years of treatment, nor was there testimony that it would not exceed two years. In other words, it could take one to two years, more than that, or less than that. In the meantime, the children would be expected to wait, in limbo. As the trial court recognized, that time frame is "a considerable period of time to wait to see if [respondent] changes."

Respondent's testimony also demonstrated his lack of insight, maturity, and judgment. For example, respondent disputed Gillmore's assessment that he needed treatment for problematic sexual behaviors, and testified that he did not have problematic sexual behaviors. Although respondent maintained that, having some hindsight, he would not make the same decision that he did with LH, he explained that he would not make the same decision because he "wouldn't be sitting in this courtroom today." The children's need for permanence and stability outweighs any bond that may exist with respondent. The children cannot wait in limbo for positive changes to potentially manifest.

We are not left with a definite and firm conviction that the trial court made a mistake by finding that termination of respondent's parental rights to the minor children was in the children's best interests.

Affirmed.

/s/ Kathleen Jansen
/s/ Michelle M. Rick
/s/ Sima G. Patel