*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* D. M. A. N., Minor.

FOR PUBLICATION
February 21, 2025
10:47 AM

Nos. 364518; 364520
Wayne Circuit Court
Family Division
LC No. 2022-000880-NA

Before: BOONSTRA, P.J., and M. J. KELLY and MALDONADO, JJ.

PER CURIAM.

In these consolidated appeals,[1] respondent-mother and respondent-father appeal by right the trial court's termination of their parental rights to their minor child, DN. Respondent-mother's parental rights were terminated under MCL 712A.19b(3)(b)(*ii*) and (j), and respondent-father's parental rights were terminated under MCL 712A.19b(3)(b)(*i*), (j), and (k)(*ix*). For the reasons stated in this opinion, we affirm in part and reverse and remand for further proceedings consistent with this opinion.

## I. BASIC FACTS

This case arises following DN's disclosure to her preschool teacher that respondent-father had sexually abused her and that respondent-mother was aware of the abuse. The abuse described by DN was extensive and graphic. She stated that respondent-father would "tickle" her "cuckoo" with his mouth, his hands, his "cuckoo," and a belt. She stated that he would push and pull the belt out of her. She pointed to her vagina to describe her "cuckoo." When asked what respondent-father's "cuckoo" was "she pointed between her legs again in a shoving motion." She indicated that respondent-father "humped" her with his "cuckoo" until "he came" and that he also put his "cuckoo" in her mouth. She reported that when she told respondent-mother that "cum was nasty," respondent-mother responded that it was "not that bad." DN reported that respondent-father's

---

[1] *In re D M A Nabors Minor*, unpublished order of the Court of Appeals, entered January 17, 2023 (Docket Nos. 364518 and 364520).

actions hurt. She added that even though she did not like water, he would make her drink water and would tell her "to be strong."

At the time, DN was four or five years of age. She had been exhibiting "inappropriate" behavior with her classmates during "every day" of preschool. On the day that she made the disclosures, DN was trying to force another child's head between her legs. DN's teacher explained that, previously, the inappropriate behavior included DN pulling other children on top of herself, pulling at their clothing, and having them sit in her lap. DN's teacher stated that she had spoken both in person and over the phone with respondents about DN's behavior. She stated that respondent-mother appeared dismissive and told her that DN exhibited the same behaviors with respondent-father at home. Respondent-mother also told a caseworker that respondent-father was never alone with DN.

After DN disclosed the abuse, DN's teacher reported it to Children's Protective Services. Petitioner, the Department of Health and Human Services (DHHS), removed DN from respondents' care and placed her with her maternal grandmother as part of a temporary voluntary agreement. In a subsequent forensic interview, DN did not disclose any abuse. Yet, the trial court ordered DN to be removed from her maternal grandmother's care because of coaching suspicions. Some of DN's other relatives were interested in DN being placed in their care and they expressed that interest to DHHS, but were not investigated to determine whether they would be suitable for placement. Rather, DHHS placed DN with a non-relative foster care family. While on the way to her foster placement, DN was crying and asked "if my daddy stops doing stuff to me, can I go back home?" She also made statements to her foster family like "my daddy did stuff to me" followed by statements that "my daddy didn't touch me and my daddy loves me very much."

Before the adjudication trial, DHHS moved to admit DN's statements through her teacher's testimony under the tender-years hearsay exception. See MCR 3.972(C)(2). Following a hearing on the motion, the court determined that DN's statements to her teacher were reliable and trustworthy. Accordingly, the court admitted the teacher's testimony regarding those disclosures as substantive evidence. Thereafter, following the adjudication trial, the court found statutory grounds to exercise jurisdiction over DN. And, following a termination hearing, the court found statutory grounds to terminate respondents' parental rights to DN and that termination of their parental rights was in DN's best interests. This appeal follows.

II. TENDER-YEARS TESTIMONY

A. STANDARD OF REVIEW

Respondents argue that the trial court abused its discretion by admitting the teacher's testimony regarding DN's statements. This Court reviews a trial court's decision to admit or exclude evidence for an abuse of discretion. *In re Brown/Kindle/Muhammad Minors*, 305 Mich App 623, 629; 853 NW2d 459 (2014). "An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *Id*. (quotation marks and citation omitted).

B. ANALYSIS

The rules of evidence apply during the adjudicative phase of child protective proceedings. *In re Archer*, 277 Mich App 71, 81; 744 NW2d 1 (2007); MCR 3.972(1). Thus, unless an exception applies, hearsay is inadmissible during an adjudication trial. See MRE 802. At issue in this case is the tender-years hearsay exception set forth in MCR 3.972(C)(2), which provides:

Any statement made by a child under 10 years of age . . . , regarding an act of child abuse, child neglect, confirmed sexual abuse, or confirmed sexual exploitation, as defined in MCL 722.622(g), (k), (q), or (r), performed with or on the child by another person may be admitted into evidence through the testimony of a person who heard the child make the statement as provided in this subrule.

(a) A statement describing such conduct may be admitted regardless of whether the child is available to testify or not, and is substantive evidence of the act or omission if the court has found, in a hearing held before trial, that the circumstances surrounding the giving of the statement provide adequate indicia of trustworthiness. This statement may be received by the court in lieu of or in addition to the child's testimony.

(b) If the child has testified, a statement denying such conduct may be used for impeachment purposes as permitted by the rules of evidence.

(c) If the child has not testified, a statement denying such conduct may be admitted to impeach a statement admitted under subrule (2)(a) if the court has found, in a hearing held before trial, that the circumstances surrounding the giving of the statement denying the conduct provide adequate indicia of trustworthiness.

"The reliability of a statement depends on the totality of the circumstances surrounding the making of the statement." *In re Archer*, 277 Mich App at 82. "Circumstances indicating the reliability of a hearsay statement may include spontaneity, consistent repetition, the mental state of the declarant, use of terminology unexpected of a child of a similar age, and lack of motive to fabricate." *Id*. Here, the trial court found that the circumstances surrounding DN's hearsay statement provide adequate indicia of reliability. In particular, the court considered the spontaneity of her statements, her use of terminology unexpected of a four-year-old child, and lack of motive to fabricate.

On appeal, respondent-father argues that the statements were not reliable because DN's teacher was not trained in forensic interview protocols and only claimed to have taken a "three credit" course to learn how to question a child. He also points out that the conversation was in private and was not recorded. Yet, the tender-years hearsay exception does not require that the child's statements be made in a recorded interview or as a result of a forensic interview. See *In re Brown/Kindle/Muhammad Minors*, 305 Mich App at 629 (holding that the trial court correctly admitted under the tender-years exception the children's unrecorded statements to workers who interviewed them at school and to a child's statement to his grandmother that was not the result of a forensic interview). Here, although DN's teacher was not trained in forensic interview protocols, she asked open-ended questions and would follow up on statements made by DN.

Respondent-mother asserts that the statements lack spontaneity. She points out that DN was confronted by her teacher in the classroom and was then taken to a separate location. She speculates that DN might have felt as if she were in trouble. The record, however, suggests that the child's statements were spontaneous. She was not being interviewed for the purpose of ascertaining whether she was being sexually abused. Rather, she was being asked to explain her behavior. During that conversation, she stated that respondent-father tickled her "cuckoo" with his mouth, hands, "cuckoo," and a belt. She used gestures to aid her disclosure by pointing to her vagina to describe her "cuckoo" and by making a shoving gesture near her vagina when describing respondent-father's "cuckoo." She offered other details, such as "cum" tasting "nasty" and respondent-mother telling her that it did not. She stated that respondent-father would "hump" her until "he came" and that his actions hurt her. She added that respondent-father gave her water and told her "to be strong." She volunteered additional details, such as the fact that she was given two glasses of water and that she did not even like water.

Some of DN's terminology was age appropriate, such as her reference to her vagina and respondent-father's penis as "cuckoos." But the majority of her terminology was unexpected of a four-year-old child given that she described "cum" as "nasty," her description of respondent-father humping her until "he came," her use of a shoving gesture near her vagina to describe how she was touched, and her description of respondent-father pushing and pulling the belt out of her.

Another indicium of reliability is DN's history of inappropriate behavior at school. Her behavior included pulling other children on top of her, having them sit on her lap, or pulling at their clothing. Respondent-mother's testimony that DN would do the same thing with respondent-father suggests that DN learned her behaviors at home. Moreover, DN told her teacher that when she told respondent-father about "bad touch" following a classroom discussion, he told her that he could touch her anywhere because she was his daughter and that she could touch him anywhere. Next, respondent-mother reported to the caseworker that she never left DN alone with respondent-father. And testimony related to when the child was picked up or dropped off at preschool corroborated that respondent-father never picked her up by himself. Such testimony allows for an inference that respondent-mother was aware of the abuse and was trying to minimize it from happening again.

The testimony regarding what happened after DN was removed also lends reliability to DN's statements. After she was removed from her maternal grandmother's care due to suspicions that she was being coached, DN asked if she could return home if her "daddy" stopped "doing stuff." Moreover, whenever she made statements that respondent-father had done "stuff to" her, she would correct it by stating that respondent-father had not touched her and that he loved her. Such statements support the inference that her initial disclosure was reliable and that, after being coached while in the care of her grandmother, she tried to hide the abuse in order to be returned to respondents' care.[2]

_____

[2] Although not part of the tender-years hearing, during the adjudication trial/termination hearing, a trauma assessment clinician testified that she interviewed DN. During the interview, she provided DN with a doll wearing a bathing suit and asked her whether the bathing suit covered the

-4-

Finally, there is no indication that DN had any motive to fabricate the allegations. Rather, the only suggestion of fabrication came from respondents, who suggested that DN's teacher had fabricated the disclosure. According to a caseworker, respondent-father suggested that the reason for the fabrication was because the teacher was "jealous" that DN had a two-parent household. There was, however, no evidence of a negative history between respondents and the teacher.

In light of the foregoing, we conclude that the trial court did not abuse its discretion by allowing the admission of the teacher's testimony regarding DN's statements.

## III. BURDEN OF PROOF

Respondent-mother next argues that the trial court incorrectly found statutory grounds to terminate her parental rights by a preponderance of the evidence instead of by clear and convincing evidence. In support, she points to parts of the court's oral opinion and written opinion where the court referenced the preponderance-of-the-evidence standard. Specifically, the court stated that it found "by a preponderance of the evidence that it is in the best interests of the child to terminate mother's and father's parental rights." And, in its written opinion, the court stated that, after considering the best interests factors, "the court finds by a preponderance that termination" was in DN's best interests. Although statutory grounds must be established by clear and convincing evidence, the question of "whether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 80, 90; 836 NW2d 182 (2013). Given that the court explicitly was referring to its best-interests findings when referring to the preponderance-of-the-evidence standard, there is no merit to respondent-mother's claim that the wrong evidentiary burden was used to find statutory grounds.

Finally, respondent-mother also asserts that the trial court erred in the best-interests phase of the case by not considering whether DN was in a relative placement. A trial court must also "explicitly address whether termination is appropriate in light of the children's placement with relatives." *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). DN, however, had been removed from her maternal grandmother's care. And, at the time of the termination hearing, she was placed in non-relative foster care. Thus, there was no need for the court to consider whether relative placement weighed against a finding that termination of respondents' parental rights was in DN's best interests.

## IV. STATUTORY GROUNDS

Next, respondent-father argues that there was insufficient evidence to terminate his parental rights because, following a physical examination, no evidence of sexual abuse was

---

doll's "cuckoo." The clinician testified that DN "had a very strong response" and "yelled out, 'eww, why would you [use] that word?' " When asked what she would call parts of her body, she indicated multiple times that she was not going to talk about it. And when asked why respondent-mother was "mad" at DN's teacher, she again stated, matter-of-factly, "we're not going to talk about that."

reported, the police did not pursue a criminal case against him, and the teacher's testimony was contradicted by other witnesses.

Respondent-father's parental rights were terminated under MCL 712A.19b(3)(b)(*i*), (j), and (k)(*ix*) provide:

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

> * * *

> (b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:

> (*i*) The parent's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home.

> * * *

> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if the child is returned to the home of the parent.

> (k) The parent abused the child or a sibling of the child, the abuse included 1 or more of the following, and there is a reasonable likelihood that the child will be harmed if returned to the care of the parent:

> * * *

> (*ix*) Sexual abuse as that term is defined in section 2 of the child protection law, 1975 PA 238, MCL 722.622.

Here, as indicated above, the teacher's testimony regarding DN's statements was admissible under the tender-years hearsay exception. DN described respondent-father as ejaculating in her mouth, humping her vagina with his penis until he ejaculated, and using his belt and his fingers to touch her vagina. That testimony is sufficient to establish that respondent-father sexually abused DN and that there was a reasonable likelihood that she would be harmed if returned to his care.

Although respondent-father points out that the police closed the case, "a parent need not be criminally charged with or convicted of criminal sexual conduct" for MCL 712A.19b(3)(k)(*ix*) to apply. *In re Schadler*, 315 Mich App at 410. Accordingly, the lack of charges stemming from

the police investigation does not render the court's findings clearly erroneous.[3] Respondent-father further contends that there were other witnesses whose testimony contradicted the teacher's testimony regarding DN's behavior in class. However, the trial court was not required to credit those witnesses. See *id*. at 408-409 (noting that due regard must be "given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it."). Here, the court noted the discrepancies, but found that they did not detract from the credibility of DN's teacher. That finding was not clearly erroneous. Finally, respondent-father points out that the medical examination did not reveal any physical signs of sexual abuse. Although that fact would allow the court to discredit DN's disclosures, that was only one piece of evidence that the court had to consider. The fact that the court did not find that dispositive does not render the court's findings clearly erroneous.

## V. BEST INTERESTS

Respondent-father challenges the trial court best-interests determination. "In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts Minors*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012) (citations omitted). Respondent complains that the trial court erred by failing to focus on his bond with DN. However, the trial court recognized that respondent-father had a bond with DN. However, it found that his sexual abuse of her overshadowed that bond. Moreover, although respondent-father contends there was no evidence that he could not properly parent DN and provide her with care, the court found that respondent-father had sexually abused DN. Proper parenting and care of a child does not include sexually abusing them. The court did not clearly err by finding that it was in DN's best interests to terminate the parental rights of respondent-father after he had sexually abused her.

## VI. DUTY TO INVESTIGATE RELATIVE PLACEMENTS

Respondent-mother mentions that DHHS failed to investigate potential relative placements before placing DN with an unrelated foster family. Specifically, she suggests that because DHHS failed its statutory duty to investigate relative placements, the trial court should have treated DN as if she were placed with a relative when making its best-interests determination. We conclude that the trial court did not err by declining to treat the child as if she were placed with relatives when she was, in fact, not placed with relatives.

That does not end our inquiry, however. Although respondents have not argued that DHHS's failure to investigate relative placements is an independent basis for reversal, we have "discretion to review a legal issue not raised by the parties." *In re C Walters Minor*, ___ Mich

---

[3] Respondent-father states that the police "did not believe" DN. However, that is speculation. It is equally likely that the police believed that DN was sexually abused, but, given that she did not make any disclosures at the forensic interview and given the lack of physical evidence, they may have concluded that they would be unable to obtain a conviction. Regardless, even if the police disbelieved DN, the trial court was free to believe her disclosure.

App \_\_\_, \_\_\_; \_\_\_ NW3d \_\_\_ (2025) (Docket No. 369318); slip op at 2 (quotation marks and citation omitted). Because we cannot overlook the fact that DHHS completely disregarded its obligation under MCL 722.954a(2) to investigate relative placements, we exercise that discretion and consider this issue notwithstanding respondents' failure to preserve the issue for review or to raise it as an issue on appeal.

Because the issue was not preserved for appellate review, our review is for plain error affecting substantial rights. *Id*. at \_\_\_; slip op at 7. To establish plain error, a respondent must show: "(1) error occurred; (2) the error was 'plain,' i.e., clear or obvious; and (3) the plain error affected their substantial rights. And the error must have seriously affected the fairness, integrity or public reputation of judicial proceedings." *Id*. (quotation marks and citation omitted).

MCL 722.954a(2) provides that when a child is removed from his or her parents, DHHS "must, within 30 days, identify, locate, notify, and consult with relatives to determine placement with a fit and appropriate relative who would meet the child's developmental, emotional, and physical needs." It is clear from the record that this obligation was not met. Multiple relatives expressed interest in caring for DN, but DHHS did not explore their fitness. This conduct fell foul of DHHS's statutory duties and put at risk DN's right to maintain a relationship with safe relatives. At the termination hearing, DHHS offered two excuses for its failure to comply with its statutory duty to investigate relative placements. First, a caseworker testified that no relative placements were considered because there were suspicions that DN's maternal grandmother had coached DN. Second, a different DHHS employee testified that no relative placements were considered because there was a court order directing that the child not be placed with relatives. No such order appears in the record. Neither explanation allows DHHS to exempt itself from its statutory duty under MCL 722.954a(2). Therefore, on this record, it is plain that DHHS did not comply with its statutory duty.

Skipping to the fourth factor in a plain-error analysis, we conclude that the failure to even attempt to keep DN from being separated from her biological family seriously affects the fairness, integrity, and public reputation of judicial proceedings. *In re C Walters Minor*, \_\_\_ Mich App at \_\_\_; slip op at 7.

The remaining question, therefore, is whether the error affected substantial rights. Normally, this Court would consider whether the error affected a *party's* substantial rights. See *Quint v Quint*, \_\_\_ Mich App \_\_\_, \_\_\_; \_\_\_ NW2d \_\_\_ (2024) (Docket No. 368002); slip op at 8. However, under some circumstances, it is also appropriate to consider whether the error affected a non-party child's substantial rights if a child's rights are affected by the error. *Id*. At the outset, it is clear that DHHS's failure to investigate a relative placement can have an affect on a respondent-parent's interests. This is because the fact that a child is placed with a relative is an explicit factor that must be considered by the trial court when considering whether termination of a parent's parental rights is in the child's best interests. *In re Olive/Metts, Minors*, 297 Mich App at 43. Yet, the child's rights are also implicated. MCL 722.954a creates a statutory preference for placement with relatives. Such a placement prevents the child from being separated from his or her family, thereby preserving important familial bonds even in the face of allegations that the child's parent or parents are unfit to provide care. Finally, "[t]he focus at the best-interest stage has always been on the child, not the parent." *In re Atchley*, 341 Mich App 332, 346; 990 NW2d 685 (2022) (quotation marks and citation omitted). Indeed, the trial court is tasked with finding

whether it is in the *child's best interests* to terminate the parental rights of an unfit parent. MCL 712A.19b(5). Accordingly, given that the child's rights are also directly impacted by the failure to consider relative placement, it is appropriate to consider whether the failure affected *the child's* substantial rights.

On the present record, we cannot ascertain whether the child would or would not have been placed with relatives if DHHS had not ignored its statutory duties. Because DHHS conducted no investigation of the relatives willing to accept placement of DN, there is nothing on the record to determine whether a relative placement exists that can "meet all relevant state child protection standard," MCL 722.954a(2), and that is in DN's best interests, see MCL 722.954a(5). If none of DN's relatives were suitable for placement, then no substantial rights would have been affected by the failure to investigate relative placements. But if DN had suitable relatives willing to accept placement, then she should have been placed with those relatives at the outset of the proceedings. Such a placement would have weighed against a finding that termination of respondents' parental rights was in DN's best interests. It would have also protected DN's interest in maintaining a familial relationship with her suitable relatives. Ultimately, because it is impossible to know how this case would have unfolded had DHHS investigated relative placements as required by law, we conclude that the trial court's best-interests decision is conditionally reversed and we remand for a determination as to whether a suitable relative placement is available.

## VII. CONCLUSION AND DIRECTIONS ON REMAND

We affirm the trial court's decision to admit DN's statements through her teacher's testimony. Further, because DHHS's failure to investigate a relative placement does not affect the trial court's finding that there were statutory grounds to terminate respondents' parental rights and because the trial court did not clearly err by finding statutory grounds to terminate respondents' parental rights, we affirm that decision.

Based upon DHHS's failure to comply with its statutory duty under MCL 722.954a(2) to investigate relative placements, we conditionally reverse the trial court's findings that termination of respondents' parental rights was in DN's best interests and we remand for further proceedings related to DHHS's failure to investigate relative placements. See *In re Morris*, 491 Mich 81, 122-123; 815 NW2d 62 (2012) (conditionally reversing the trial court and remanding for resolution of a notice issue).[4] On remand, if the evidence establishes that there are no suitable relative placements available, the termination order shall be reinstated. If, however, DHHS's investigation under MCL 722.954a(2) results in a finding that a suitable relative placement exists, then DHHS shall make a placement decision as required by MCL 722.954a(5). Further, DHHS must comply with the notice requirements in MCL 722.954a(4). And a challenge to the placement decision may be made as set forth under MCL 722.954a(9). If a challenge to the placement decision is timely made, the trial court must hold a hearing as required in MCL 722.954a(9). After that hearing, the trial court must enter as order either approving or disapproving of DHHS's placement decision.

---

[4] Although *Morris* involved the Indian Child Welfare Act (ICWA), 25 USC 1901 *et seq.*, we conclude that the remedy of a conditional reversal is also warranted in this case in light of DHHS's clear disregard of the statutory preference for a child to be placed with relatives.

See MCR 3.966(2).  Thereafter, the trial court shall reconsider whether termination of respondents' parental rights is in the child's best interests.  Because this is a case in which termination has been sought with the initial petition, and because there are aggravating circumstances, DHHS does not have a duty to provide reasonable reunification efforts to respondents on remand.  See MCL 712A.19a(2) and MCL 722.638.

Affirmed in part, conditionally reversed in part, and remanded for further proceedings consistent with this opinion.  We do not retain jurisdiction.

/s/ Mark T. Boonstra
/s/ Michael J. Kelly
/s/ Allie Greenleaf Maldonado